UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| M-I, L.L.C., | § | |
| | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| v. | § | **CIVIL ACTION NO. H-09-cv-01552** |
| | § | |
| CHAD LEE STELLY, et al., | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM AND ORDER

Before the Court is Plaintiff's Emergency Verified Motion for Expedited Preliminary Injunction (Doc. No. 8), Plaintiff's Motion for Leave to File Amended Complaint and Application for Injunctive Relief (Doc. No. 63), and Plaintiff's Motion in Opposition to Defendant's Request to Continue Preliminary Injunction Hearing (Doc. No. 73). After considering the parties' filings, all responses and replies thereto, and the applicable law, the Court finds that Plaintiff's Emergency Verified Motion for Expedited Preliminary Injunction should be denied, Plaintiff's Motion for Leave to File Amended Complaint and Application for Injunctive Relief should be granted, and Plaintiff's Motion in Opposition to Defendant's Request to Continue Preliminary Injunction Hearing should be denied as moot.

## I.     BACKGROUND

M-I, L.L.C. ("M-I.") leases specialized tools to operators who clean out oil and gas wellbores. (Mtn. Hr'g Tr., July 16, 2009, 81:15-82:19.) In November 2002, M-I hired Defendant Chad Stelly as a full time shop supervisor. (Tr. 209:1.) As a shop

supervisor, Stelly supervised M-I's Speedwell tool manufacturing, assembly, and disassembly. (Tr. 204:21-205:6.) M-I had a policy in place which dictated that new hires must execute an M-I employment packet before beginning employment. (Pls.'s Ex. 4 at 467-470.; Tr. 211:16-212:2.)   The packet includes M-I's Employee Invention and Confidential Information Agreement and the Trade Secret Agreement and Covenant Not to Compete ("Non-compete"). *Id*. Sometime around November 2002, Stelly signed the Non-compete. (P's Ex. 4 at 469.)

By signing the Non-compete, Stelly agreed that, for two years after termination, he would not directly or indirectly compete with M-I in the territory in which he was employed at any time in the previous two years of his employment with M-I. The Non-compete defined "Territory" as "all counties, parishes, or cities in which [Stelly] was employed, as well as all territory within a zone of 300 miles radius from a facility, location, or office of M-I in which [Stelly] was employed." (Pls. Ex. 4 ¶ 1.)  Stelly further agreed that, after his termination, he would preserve confidential trade secrets of M-I that had been or may have been obtained by him by reason of his employment.  In addition, he agreed that he would not, without written authority from M-I, use such trade secrets for his own benefit or purpose, nor disclose them to others, nor take, retain, or copy any documents containing trade secrets. (*Id*.) The Non-compete defined "direct competition" as "design, development, production, promotion or sale of products or services competitive with those of M-I" and indirect competition as "employment by any competitor or third party providing competing products or services to M-Is products or services for whom [Stelly] will perform the same or similar functions as [he] performed for M-I." (Pls. Ex. 4 ¶ 6.)  Finally, the Non-compete defined "trade secrets" as including,

but not limited to "drawings, designs, technical manuals, plans, proposals, marketing and sales plans, customer lists, financial information, costs and pricing information owned or developed by M-I and geological and other information acquired in confidence by M-I from its customers that has not previously been publicly released by duly authorized representatives of M-I or its customers." (*Id.*)

Prior to 2006, M-I developed its own line of clean out tools called "Speedwell." (Tr. 56:17-57:7.)   In early August 2006, M-I acquired Specialized Petroleum Services International, Inc. ("SPS").   (Tr. 56:17-57:7.)   As part of the acquisition, M-I obtained SPS's line of tools and its trained personnel, which included Defendants Chuck Knobloch and Steve Squyres, as well as other employees who have since left M-I to work at Wellbore.   (Tr. 56:17-57:7; Tr. 248:4-249:8; Tr. 25:7-29:13.)   At that time, Squyres agreed to M-I's employment packet, including the Non-compete. (P's Ex. 2 at p. 83-99.)[1] The terms of Squyres' Non-compete were identical to those of Stelly's Non-compete described above.   Squyres began working as a sales manager and was primarily responsible for the sale of Speedwell and SPS tools in the southern United States, including the Gulf of Mexico, Texas, Louisiana, and Alabama.   (Tr. 95:25-96:8.) Plaintiff alleges that Squyres received the following confidential information: Pricing and Discount Agreements (Tr. 91:12; Tr. 128:4-13); Engineered Tool Drawings (Tr. 127:5);

---

[1] Plaintiffs attached the non-compete of Kevin Squyres, who is not a party, to its Third Amended Complaint. (Pl. Mot. Ex. B.)  Further, Kenneth Pope, M-I's representative, identified Kevin Squyres' non-compete as the document M-I was seeking to enforce during his deposition.  Plaintiff has moved for leave to amend the Third Amended Complaint in order to attach Steven Squyres' Non-compete to the Complaint and its Motion for Injunctive Relief. (Doc. No. 63.)  Defendants assert that Plaintiff should not be allowed to amend because Plaintiff's use of Kevin Squyres' non-compete, and Kenneth Pope's reference to that document in his deposition, are more than mere clerical errors.  Defendants did not object to Plaintiff's use of the incorrect non-compete until the evidentiary hearing, and Steven Squyres identified the non-compete he signed at the hearing.  Further, Defendants have not demonstrated that they have been harmed by the error.  For these reasons, and it is this Court's preference to resolve cases on the merits rather than technicalities, Plaintiff's Motion to Amend is granted.

Monthly Revenue/Expense Statements (Tr. 95:20); Sales Forecasts (Tr. 127:11); Tool Utilization Reports (Tr. 96:10; Tr. 127:9); New Tool Information (Tr. 89:1; Tr. 127:14); NCRs (Tr. 35:21; Tr. 93:5; Tr. 127:7); Market Strategy (Tr. 84:10); and Job Tracker (Tr. 88:11.)  Ken Simpkins, M-I's Vice President of Wellbore Productivity, alleges that, in particular, in 2007 and 2008, Squyres knew the details of M-I's research and development of three new tools.  (Tr. 88:20.)

At the time M-I acquired SPS, Knobloch was the Manager of Sales for the Americas.  (Tr. 25:16-18.)   In September 2006, Knobloch resigned from M-I and immediately formed Wellbore Energy Solutions, L.L.C ("Wellbore").   (Tr. 265:1-5.) Within two weeks of forming the company, Knobloch hired Todd Roy, who had been in M-I's sales department and was the former operations manager for SPS.  (Tr. 29:5-15.) Plaintiffs contend that, over the next two years, Wellbore continued to "raid" M-I employees by hiring them away.  In 2007, Wellbore hired three employees from M-I, including Phillip Morgan, M-I's Senior Applications Engineer, Shawn Richard-Landry, M-I's Operations Clerk, and Mark Lagrange, a shop technician.  (Tr. 29:14-22; Tr. 260:16-266:6.)   Each of these three employees is still employed at Wellbore, and each signed a non-compete while at M-I's.  (Tr. 288:11-19; Tr. 260:16-266:6.)  In 2008, Wellbore hired nine more employees, including Donald Turner, a shop technician, Nick Briscoe, an SPS Tool Service Specialist, Kevin Squyres, an SPS Tool Service Specialist; Scott Leger, a shop technician, Dale Williamson, an SPS Tool Service Specialist, Kevin Duhon, a shop technician, Jerry Lanthier, an SPS Tool Service Specialist, Josh Cormier, an SPS Tool Service Specialist, and Squyres, the Sales Manager.  (Tr. 261:19-267:15.)

4

Each of these employees signed a non-compete, and most continue to work for Wellbore. (Tr: Tr. 261:19-267:15; 288:11-19.)

In 2007, Stelly became an account manager for M-I. (Tr. 203:21-25.) Stelly was responsible for selling both Speedwell and SPS tools in the southern United States, including the Gulf of Mexico, Alabama, Louisiana, and Texas. (Tr. 106:10-20.) While working at M-I, Stelly called on BP, Chevron Corporation, Devon Energy Corporation, Eni, Exxon Mobil Corporation, Marathon Oil Corporation, and Walter Oil and Gas Corporation to sell M-I's clean out tools. (Tr. 101:5-9; Tr. 107:9-14.) Plaintiff alleges that, as part of his duties, Stelly would have received the following confidential information: Pricing and Discount Agreements (Tr. 226:24); Engineered Tool Drawings (Tr. 90:14); New Tool Filed Trials (Tr. 89:17-90:4); New Tool Presentations (Tr. 36:23); Tool Machine Drawings (Tr. 36:10); New VRDT/Well Scavenger Presentation (Tr. 55:7); NCR Report (Tr. 92:23; 94:1; Tr. 202:14); Discount Strategy (Tr. 91:4); and Job Proposals and Well Procedures (Tr. 110:11; 112:23.) Plaintiff alleges that all of this information is confidential and was received after M-I's promise to provide confidential information. Stelly also took at least one course providing an overview of M-I's products and services. (Tr. 212:13.)

On March 3, 2009, Stelly left M-I for Wellbore. (Tr. 215:13-216:1.) Stelly informed Wellbore and Knobloch that he had a non-compete with M-I. (Tr. 214:18-215:8; 218:21-25.) Stelly's job assignment at Wellbore was to support Wellbore's "Clean Well Products" in the Gulf of Mexico. (Tr. 214:18-215:8; Tr. 218:21-25.) These Clean Well Products are identified as particular tools in Wellbore's catalogue, and they compete with M-I's SPS and Speedwell tools. (Tr. 217:6-25; Tr. 109:18-22.) Plaintiff

now asserts that, even after the parties entered into the Agreed Temporary Injunction, Stelly continued to violate the Non-compete by leasing Wellbore's Clean Well Products in competition with M-I's tools, to the same customers he had served while at M-I, including Exxon (Tr. 224:15-25; 244:11-245:7), Marathon (Tr. 224:25); Walter Oil (Tr. 225:13-18) and Chevron (Tr. 229:12-231:10).

Plaintiff filed sued against Defendants on March 18, 2009, alleging several causes of action, including breach of trade secret agreement, misappropriation of trade secrets, tortious interference with contract, tortious interference with business relationships, and conspiracy. Plaintiff amended its Complaint on April 21, 2009 to add claims pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

On May 7, 2009, the parties entered into an agreed temporary injunction ("Agreed Injunction") in state court. (Doc. No. 66, Ex. A.) Squyres agreed to return to M-I within five days of entry of the Agreed Injunction, and to immediately cease and desist from disclosing to others, any of M-I's trade secrets, as defined by his Employee Invention and Confidential Information Agreement. (Doc. No. 66, Ex. A ¶ 1.) Stelly agreed to return to M-I within five days, and to cease and desist from disclosing, any M-I trade secrets or M-I's confidential technical and other business information. (Doc. No. 66, Ex. A ¶ 2.) Stelly also agreed that, for a period of one year, beginning in March 10, 2009, not to contact BP or Chevron for the purpose of promoting, selling, leasing, or providing technical services that are the same or similar to those he sold, leased, or provided while employed at M-I with respect to the tools described in the Agreed Injunction's Schedule 1. (Doc. No. 66, Ex. A ¶ 3.) Finally, Squyres and Stelly were restrained from inducing any M-I employees to leave its employ. (Doc. No. 66, Ex. A ¶ 4.)

After the agreement was signed, in May 2009, M-I suspected that Squyres was selling Wellbore tools to BP that directly competed with those he sold to BP while working at M-I.   M-I's suspicion was based on the fact that BP awarded the Thunderhorse Project 778 #2 Well ("Thunderhorse Project") to Wellbore instead of M-I because of Squyres' sales efforts. (Tr. 79:20-25.)  Squyres admits that he is selling tools for Wellbore, as he did at M-I, for the same customers. (Tr. 247:17-248:3.)

Defendants Stelly and Squyres timely removed the case on May 21, 2009. (Doc. No. 1.)  Plaintiff filed an Emergency Motion for a Preliminary Injunction on May 26, 2009. (Doc. No. 8.)  The Court then allowed Plaintiff to conduct limited expedited discovery to support its Motion; however, the Court denied Plaintiff's request to conduct expedited discovery with respect to Defendants Wellbore and Knobloch.  On July 16, 2009, the Court held an evidentiary hearing on Plaintiff's Motion during which Plaintiff called witnesses and introduced evidence in support of a preliminary injunction.[2]

Plaintiff is not asking this Court to modify the Agreed Temporary Injunction; rather, it is seeking to enjoin Wellbore, Knobloch, Stelly and Squyres from contacting M-I's former customers for the purposes of selling tools competing with M-I. (Pl. Brief in Support of Mot. at 1.)  Specifically, Plaintiff asks that the Court prevent Wellbore from inducing any employee of M-I to leave M-I, restrain Stelly from supporting, promoting, selling, leasing and renting the Clean Well Products, as described in Plaintiff's Schedule 1, to Devon Energy, Exxon Mobil, Walter Oil, Marathon Oil, or Eni S.P.A., and restrain Squyres from supporting, promoting, selling, leasing, and renting Wellbore's Clean Well

---

[2] At the hearing, Defendants chose to reserve their right to present rebuttal witnesses and evidence until this Court ruled on Plaintiff's Motion.  Plaintiff has moved to oppose Defendant's request to continue the hearing (Doc. No. 73).  Because the Court finds that Plaintiff has not established the need for injunctive relief, Plaintiff's Motion in Opposition to Defendants' Request to Continue Preliminary Injunction Hearing will be denied as moot.

7

Products, and Wellbore's Vac Tech tool, to BP.   Plaintiff further seeks to have Defendants return to M-I, and to cease and desist from using, any M-I documents, electronic files or other property, including but not limited to drawings, non-conformance reports, designs, technical manuals, plans, proposals, marketing and sales plans, customer lists, costs and pricing information, sales and market reports, and geologic information. Finally, Plaintiff requests that the Court enjoin Defendants from deleting electronic files that may be related to the case from their personal or work computers. This Court has jurisdiction pursuant to 28 U.S.C. § 1367.

II.     **ANALYSIS**

**A. Preliminary Injunction Standard**

"A preliminary injunction requires that 'the applicant ... show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.'" *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 768 (5th Cir. 2007) (quoting *Lake Charles Diesel, Inc. v. General Motors Corp.,* 328 F.3d 192, 195-96 (5th Cir. 2003)).   Although the grant or denial of a preliminary injunction rests in the discretion of the trial court, *Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 290 (1940), "[w]e have cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *Lake Charles Diesel*, 328 F.3d at 196 (citing *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 2003)).

8

## B. M-I's Claims Against Squyres and Stelly

Plaintiff urges the Court to prevent Defendants Squyres and Stelly from contacting their former M-I customers for the purpose of selling tools that compete with M-I's product line. After the parties entered the Agreed Injunction, Plaintiff claims to have learned that Squyres was selling competing tools to BP, his former M-I client. As a result, Plaintiff claims to have lost the Thunderhorse Project to Wellbore. Plaintiff also contends that Stelly continues to sell competing products to BP and Chevron, in violation of the Agreed Injunction, and that he sells Clean Well Products to other former M-I customers. Defendants argue that Plaintiff has presented no evidence that Stelly and Squyres took any trade secrets or confidential information when they left M-I. Defendants also maintain that Stelly has not violated the Agreed Injunction and that the Non-compete Stelly and Squyres were required is unenforceable. Plaintiff argues that, even if the Court finds the Non-compete to be unenforceable, it is required to enjoin Stelly and Squyres because of the inevitable disclosure doctrine.

Stelly testified that he did not sell Clean Well Products to either BP or Chevron following the Agreed Injunction. (Tr. 224:11-225:23.) Plaintiff did offer evidence that Stelly was copied on an email BP sent to M-I employees after the Agreed Injunction was entered. (Tr. 241:11-23.) The email does not indicate, however, that Stelly communicated with BP after the Agreed Injunction in an effort to promote Wellbore's Clean Well Products. Stelly concedes that, since the Agreed Injunction was entered, he has promoted Clean Well Products to other clients including Exxon, Marathon, Infinity, and Hess. (Tr. 223:18-225:10.) Squyres and his counsel admit that he is performing the

same duties at Wellbore that he performed at M-I, for some of the same customers.  (Tr. 247:17-248:3; Doc. No. 54, 18:23-19:1.)

Defendants take the position that, even if Squyres and Stelly have directly competed with M-I, the Non-competes is unenforcable. To be enforceable under Texas law, a non-compete must be (i) ancillary to or part of an otherwise enforceable agreement at the time the agreement is made; (ii) to the extent it contains limitations as to time, geographical area, and scope of activity to be restrained, reasonable, and must not (iii) impose a greater restraint than is necessary to protect the goodwill or other business interest of the promise.  TEX. BUS. & COM. CODE § 15.50.  First, Defendants make much of the fact that Plaintiff attached another employee's non-compete to its Third Amended Complaint, instead of Squyres', and that Kenneth Pope, M-I's representative, mistakenly identified that document as Squyres' Non-compete in his deposition.  Next, Defendants argue that Squyres' Non-compete was based on past consideration because Plaintiff did not establish that Squyres signed the Non-compete before he was given access to confidential information. Finally, Defendants contend that the Non-compete contains unreasonable geographic and scope restrictions.

At this stage of the litigation, the Court can resolve Plaintiff's Motion without addressing the enforceability of the Non-compete because Plaintiff has not satisfied the second requirement for a preliminary injunction, that it will suffer irreparable harm from Stelly and Squyres' alleged competition.  Irreparable harm requires a showing that: (1) the harm to plaintiffs is imminent; (2) the injury would be irreparable; and (3) that plaintiffs have no other adequate legal remedy.  *See Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975).  "[O]nly those injuries that cannot be redressed by the application of

a judicial remedy after a hearing on the merits can properly justify a preliminary injunction." *Cortes v. City of Houston*, No. H-07-2744, 2007 WL 4376106, at *2 (S.D.Tex. Dec. 13, 2007) (quoting *Canal Auth. of the State of Florida v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)).

Simpkins was unable to identify any specific job M-I had lost because Stelly had left the company. (Tr. 162:1-9.) In fact, after Stelly's departure, M-I beat out Wellbore for Chevron's Tahiiti Project. (Tr. 160:14-16.) Simpkins speculated that M-I lost the Thunderhorse Project because of Squyres' contact with BP, but BP did not inform M-I that it had lost the contract because of Squyres' work, and Simpkins was not able to definitively say if the loss was due to Squyres or BP's preference for the Wellbore tools. (Tr. 196:3-197:18.) Simpkins testified that he first noticed that M-I was losing employees and business to Wellbore in April 2008, but M-I waited over one year from that time, and one year from Squyres's departure in March 2008, to seek an injunction. (Tr. 139:6-16.) Most important, however, is the fact that M-I has been tracking its estimated losses to Wellbore for some period of time. (Tr. 88:7-19.) Simpkins testified that, before Stelly left M-I, he created a "Job Tracker" which measured the progress of M-I and its competitors in the market. (*Id.*) Job Tracker quantifies the work M-I has lost to Wellbore. (*Id.*) M-I continues to track revenue it has lost to Wellbore and other competitors. (Tr. 194:20-195:8.) Plaintiff is therefore capable of calculating any economic damage it has and will suffer because of Wellbore's competition.[3]

---

[3] Plaintiff cites this Court's opinion in *Transperfect Translations, Inc. v. Leslie* for the proposition that an ex-employee's use of an employer's confidential information and the possible loss of customers is sufficient to establish irreparable harm. 594 F.Supp.2d 742, 757 (S.D.Tex. 2009). The facts in the instant case are distinguishable from *Transperfect*; there, the Court found that it would be difficult to know how many former Transperfect clients the defendant would be able to solicit in his new position. Here, M-I is monitoring its loses to Wellbore; it will not be difficult for the fact finder to calculate damages.

Plaintiff argues that its future losses to Wellbore cannot be calculated at this point because of volatility in the oil and gas market. According to Plaintiff, both BP and Chevron have predicted future well openings, but unknown variables make M-I's future losses difficult to predict in the near future. This does not mean, however, that the fact finder cannot determine damages M-I has suffered if the Court allows the case to proceed.

Plaintiff then cites *Unitel v. Decker* for the proposition that proof of a continued breach of a non-compete by a highly trained employee constitutes prima facie proof of probable injury. 731 S.W.2d 636 (Tex. App.—Houston [14th Dist.] 1987, no writ). Texas Appeals Courts have more recently refined this holding: when there is no proof of misuse of confidential information, irreparable harm is not presumed. *W.R. Grace & Co. v. Henson*, No. 13-06-668-CV, 2007 WL 2389547, at *3 n. 3 (Tex.App.—Corpus Christi Aug. 23, 2007, no pet.). In *W.R. Grace*, the defendant, a former sales representative for Grace, left to work for a competitor. Grace's company representative testified that he did not know if the defendant had misused any information and could not identify a specific customer that Grace had lost or was in danger of losing to defendant. The defendant continued to contact the same customers he had served while at Grace, but he testified that he did not use the confidential information from Grace in making sales calls. M-I was similarly unable to prove that Stelly and Squyres misappropriated confidential information in violation of the Non-compete. (Tr. 165:24-166:19.) Plaintiff initially alleged that its forensic computer specialist, Carey Moore, found evidence that Stelly took files with him when he left. (Tr. 166:20-25.) At the hearing, however, M-I produced no evidence indicating that Stelly had actually downloaded files related to the

12

work M-I lost to Wellbore.   (Tr. 172:23-173:1.)  Besides Simpkins's speculation regarding M-I's loss of the Thunderhorse Project, M-I offered no evidence of clients it has lost, or is at risk of losing, due to Stelly and Squyres' move to Wellbore.  As a result, the Court will not consider Stelly and Squyres' alleged violations of the Non-compete to be prima facie evidence of irreparable harm.

Finally, Plaintiff argues that, even if the Court finds the Non-compete to be unenforceable, it must restrict Squyres and Stelly from competing based on the inevitable disclosure doctrine.  The inevitable disclosure doctrine has been described by legal academics as follows:

> [T]here are circumstances in which trade secrets inevitably will be used or disclosed, even if the defendant swears that he or she will keep the information confidential. Courts applying the doctrine have differed over its reach and the circumstances required for its application, but, generally speaking, the doctrine applies when a defendant has had access to trade secrets and then defects to the trade secret owner's competition to perform duties so similar that the court believes that those duties cannot be performed without making use of trade secrets relating to the previous affiliation.

*Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 242 n. 12 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (quoting Linda K. Stevens, Trade Secrets & Inevitable Disclosure, 36 TORT & INS. L.J. 917, 929 (Summer 2001)).  Texas courts have not expressly adopted the inevitable disclosure doctrine, and it is unclear to what extent Texas courts might adopt it or might view it as relieving an injunction applicant of showing irreparable injury.  *Id.* (collecting cases).  Plaintiff cites a Dallas Court of Appeals case which subscribed to a modified version of the doctrine, enjoining an employee from using an employer's confidential information when it was probable that the former employee would use the confidential information for his benefit (or his new employer's benefit) or to the detriment of his former employer. *See Conley v. DSC*

13

*Communications Corp.*, No. 05-98-01051-CV, 1999 WL 89955, at *4 (Tex.App.—Dallas Feb.24, 1999, no pet.)   More recently, a Houston Court of Appeals declined to apply *Conley*'s reasoning, finding that the plaintiff had presented no evidence that the defendant, an ex-employee, had taken confidential information with him when he left the plaintiff's employ or that he would have any use for such information with his future employer.   Plaintiff has similarly failed to show that Stelly and Squyres took any confidential information with them or that they are using such information at Wellbore; the Court will therefore not apply the inevitable disclosure doctrine.

### C. M-I's Tortious Interference Claims Against Wellbore and Knobloch

M-I claims that Wellbore and Knobloch tortiously interfered with its contracts with fourteen of its employees that Wellbore and Knobloch hired away from M-I. "In Texas, the elements of a cause of action for tortious interference with contractual relations are (1) there was a contract subject to interference, (2) the act of interference was willful and intentional, (3) such intentional act was a proximate cause of plaintiff's damages, and (4) actual damage or loss occurred." *Juliette Fowler Homes v. Welch Associates, Inc.*, 793 S.W.2d 660, 664 (Tex. 1990).   To prove tortious interference, a plaintiff is not required to prove intent to injure but rather "only that the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it." *Amigo Broadcasting, LP v. Spanish Broadcasting System*, 521 F.3d 472, 490 (5th Cir. 2008) (quoting *Sw. Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992)).   The interfering party must have "actual knowledge of the contract or business relations in question, or knowledge of facts and circumstances that would lead a reasonable person to believe in the existence of the

contract or business relationship." *Id.* (quoting *Steinmetz & Assocs., Inc. v. Crow*, 700 S.W.2d 276, 277-278 (Tex. App.—San Antonio 1985, ref. n.r.e.)).

Plaintiff contends that Knobloch and Wellbore knew or reasonably should have known that M-I had non-compete agreements with the fourteen employees Wellbore raided.[4]   Knobloch specifically knew that Stelly signed the Non-compete with M-I before he joined Wellbore.   (Tr. 215:7-218:23.)   Knobloch signed a non-compete when he worked for Global Completion Services, but not M-I (*id.* at 270:25-271:3), and he did not require Wellbore employees to sign non-competes. (*Id.* at 269:19-25).   Wellbore and Knobloch knew that non-competes were common in the industry and at M-I, circumstances that, according to Plaintiff, would have reasonably led Defendants to believe that the fourteen employees had non-competes with M-I.     Knobloch responds that he did not actually know that Stelly had a non-compete, and that he never saw a copy of it.  (*Id.* at 268:1-25.)  Stelly testified that he told Knobloch that he had a non-compete but that he never gave him a copy of it.  (*Id.* at 215:6-10.)

Dennis Hanks, M-I's operations manager, opined that, when Knobloch was a manager of SPS at M-I, he learned the jobs, salaries, and attributes of M-I's employees, knowledge he could later use to attract employees to Wellbore.  (Tr. 26:13.)     Plaintiff further alleges that Knobloch, with full knowledge of Stelly's Non-compete, sent Stelly an offer letter and job description and offered him more money and a larger bonus to work for Wellbore.  Hanks testified that Wellbore offered all fourteen employees more money.  (Tr. 51:2-25.)

---

[4] The Court notes that Plaintiff has only alleged, in this case, that two of the fourteen employees breached their Non-competes.

Defendants Wellbore and Knobloch contend that Plaintiff has not satisfied the second or third element of a tortious interference claim because it has not demonstrated that Defendants willfully and intentionally interfered with the employees' non-compete agreements or that their acts were the proximate cause of Plaintiff's damages. "Texas courts have held that to satisfy [the second element] of the cause of action for tortious interference, a party must be more than a willing participant; it must knowingly induce one of the contracting parties to breach its obligations." *John Paul Mitchell Systems v. Randalls Food Markets, Inc.*, 17 S.W.3d 721, 731 (Tex. App.—Austin 2000, pet. denied) (citing *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 (Tex. 1993)). Entering into a contract with a party with the knowledge of that party's contractual obligations to someone else is not the same as inducing a breach. *Amigo*, 521 F.3d at 493 (citing *J.L. Davis v. HydPro, Inc.*, 839 S.W.2d 137, 139 (Tex.App.—Eastland 1992, writ denied)). A company is "merely receptive" to an employee's suggestions when the employee resigns for his own personal reasons independent of any act or inducement on the part of the new employer. *Id*. at 493, n. 26 (citing *Bray v. Squires*, 702 S.W.2d 266, 271 (Tex. App.—Houston [1st Dist.] 1985, no writ)). Further, "[t]o establish proximate cause, a party must show that 'the defendant took an active part in persuading a party to a contract to breach it.'" *Amigo Broadcasting*, 521 F.3d at 493 (citing *J.L. Davis*, 839 S.W.2d at 139). An offer of higher compensation may establish proximate cause. *Amigo*, 521 F.3d at 493. "A necessary element of the plaintiff's cause of action is a showing that the defendant took an active part in persuading a party to a contract to breach it …. It is necessary that there be some act of interference or of persuading a party to breach, for example by

offering better terms or other incentives, for tort liability to arise." *J.L. Davis*, 839 S.W.2d at 139.

Knobloch argues that every M-I employee that Wellbore has hired has approached him, or Wellbore, about the possibility of employment. (Tr. 282:25-283:7.) At least one of the former M-I employees started work at Wellbore only after working internationally, for another company. (Tr. 266:23-25.) Knobloch admits to meeting Stelly at a Buffalo Wild Wings in Lafayette, Louisiana, but he does not remember the date of the meeting. (*Id.* at 278:19-279:7.) Plaintiff did not establish what the two men discussed at this meeting and whether it related to Stelly coming to work for Wellbore. Plaintiff introduced evidence showing that Knobloch emailed Stelly an offer letter on March 3, before Stelly quit M-I, and Stelly testified that he received the email after he and Knobloch "had discussed the possibility" of him working at Wellbore. (Tr. 214:11-17.) Hanks testified that Knobloch enticed Stelly, as well as the thirteen other employees, with "more money." On cross examination, however, Hanks admitted that he only had personal knowledge that the operations personnel received more money at Wellbore. He did not testify how much more money they received, or which staff members were considered "operations personnel." (Tr. 51:2-25.) Hanks stated that M-I offered some, but not all, of these employees more money in an effort to convince them to stay at the company. (Tr. 52:1-3.) Without evidence that specific employees were offered more money, the Court cannot conclude Plaintiff is likely to succeed on the merits of its tortious interference claim.

In *John Paul Mitchell Systems v. Randalls Food Markets, Inc.*, the plaintiff, Paul Mitchell, maintained an exclusive distribution network for its hair products. The

defendant, Jade Drug Company, was not an authorized distributor, but it purchased Paul Mitchell's products from authorized distributors and resold them to various retail outlets. Jade knew that the salons had exclusive distribution agreements with Paul Mitchell and that they were probably breaching these agreements by selling the products to Jade; however, the Texas Court of Appeals found that Jade had not tortiously interfered with the contracts. *John Paul Mitchell Systems*, 17 S.W.3d at 731. Instead, it held that if one of the salons breached its agreement with Paul Mitchell, Jade's "mere participation" in the transaction did not constitute the "knowing inducement" required by Texas law. *Id.* Since there was no evidence that Jade actually persuaded the salons to breach their agreements with Paul Mitchell, the Court of Appeals denied the tortious interference claim. Other courts have followed this reasoning, holding that a third party's knowledge of the contract is insufficient to establish a tortious interference claim when there is no evidence that the third party induced the breach. *See Mary Kay, Inc. v. Weber*, 601 F.Supp.2d 839, 863 (N.D.Tex. 2009); *Coast Energy Management, Inc. v. Segal*, No. 04-02-00550-CV, 2003 WL 1964386, at *4 (Tex. App.—San Antonio Apr. 30, 2003, no pet.).

The Court finds *Paul Mitchell*'s reasoning instructive. Assuming that Defendants reasonably should have known that these fourteen employees had non-compete agreements with M-I, Plaintiff has not demonstrated that Defendants induced these employees to leave M-I, much less violate their non-competes. Knobloch provided uncontroverted testimony that all fourteen employees approached Wellbore about employment. Apart from Knobloch's meeting with Stelly at the Buffalo Wild Wings in

18

Lafayette, Plaintiff has not demonstrated that Wellbore actively recruited these employees or took steps to induce them to leave M-I.

Hanks testified that some of the M-I employees left the company for more money, which can be evidence of proximate cause of breach of contract. The cases Plaintiff cites, however, are factually distinguishable. In *Top Value Enterprises, Inc. v. Carlson Marketing Group, Inc.*, the defendant offered grocery stores three times their current advertising allowance to induce them to breach their contracts with plaintiff. 703 S.W.2d 806, 811 (Tex. App.—El Paso 1986, ref. n.r.e.). The defendants in *Amigo* flew the plaintiff's employees to Miami, paid for their lodging and food, and offered them contract terms that were "significantly more attractive" than the compensation plaintiff paid. 521 F.3d at 491-492. M-I has not offered evidence demonstrating that Wellbore offered salaries or benefits substantially greater than those offered by M-I in order to entice M-I's employees away, or even that all fourteen employees received pay raises. At this time, Plaintiff has not demonstrated a substantial likelihood that it will prevail on the merits of its tortious interference with contract claim against Defendants Wellbore and Knobloch.

Plaintiff has also failed to demonstrate that it will suffer irreparable injury if the Court does not enjoin Wellbore and Knobloch from hiring more M-I employees. Hanks testified that other employees were at risk of leaving M-I for Wellbore, but he admitted that they were also at risk of leaving M-I and going to other companies, and he did not specify which employees were likely to leave. (Tr. 57:8-15; 33:17-34:1.) M-I has not, therefore, demonstrated that there is imminent harm that Wellbore will tortiously interfere with any additional M-I employment agreements or non-competes.

## III.   CONCLUSION

For these reasons, Plaintiff's Emergency Verified Motion for Expedited Preliminary Injunction is **DENIED**.   Plaintiff's Motion to Amend Complaint and Application for Preliminary Injunction is **GRANTED** and Plaintiff's Motion in Opposition to Defendants' Request to Continue Preliminary Injunction Hearing is **DENIED AS MOOT**.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 30th day of July, 2009.

GRAY MILLER
UNITED STATES DISTRICT JUDGE

**TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT.**