IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **M-I L.L.C.** | § | |
| | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO.** |
| | § | **4:09-CV-01552** |
| **CHAD LEE STELLY,** | § | |
| **STEPHEN SQUYRES,** | § | |
| **BENTON THOMAS KNOBLOCH,** | § | **JURY REQUESTED** |
| **And WELLBORE ENERGY SOLUTIONS,** | § | |
| **L.L.C.** | § | |

## SECOND AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, M-I L.L.C., hereinafter referred to as Plaintiff or "M-I", complaining of Chad Lee Stelly, Stephen Squyres, Benton Thomas Knobloch, and Wellbore Energy Solutions, LLC ("WES") hereinafter referred to as Defendants, and for cause of action would respectfully show unto the Court and jury as follows:

### I. PARTIES

1.      Plaintiff is a corporation with an office in Harris County, Texas, and which has authority to do business in the State of Texas.

2.      Defendant Stephen Squyres has been served and answered.

3.      Defendant Chad Lee Stelly has been served and answered.

4.      Defendant, Benton Thomas Knobloch, has been served and answered.

5.      Defendant, Wellbore Energy Solutions, LLC, ("WES") is a foreign corporation doing business in Texas and has been served and answered.

## II. VENUE AND JURISDICTION

6.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, 1441 and 18 U.S.C. § 1030.

7.      Venue is proper in the Southern District of Texas because Stelly and Squyres reside in Harris County, Texas, and because a substantial part of the events or omissions giving rise to the claims plead below occurred in Harris County, Texas.

### III. FACTS

8.      M-I is an oilfield contractor providing products and services to oilfield drillers and operators who are involved in successful completion of downhole operations and the cleanout of wellbores.

9.      Squyres and Stelly were employed by M-I in its offices in Houston, Harris County, Texas.  They each executed a Trade Secret Agreement and Covenant Not to Compete. Squyres executed and agreed to his Trade Secret Agreement and Covenant Not to Compete on or around August 3, 2006, and Stelly executed and agreed to his Trade Secret Agreement and Covenant Not to Compete on or around November 5, 2002.  Pursuant to their Trade Secret Agreement and Covenant Not to Compete, Squyres and Stelly each agreed that upon termination of their employment with Plaintiff that they would maintain confidential all of Plaintiff's technology, trade secrets and proprietary and confidential information.  Squyres and Stelly also agreed not to compete against Plaintiff for a period of time of two years after such termination of employment with Plaintiff and to refrain from certain activities in competition against Plaintiff, such as providing the same or similar function with a competitor that they did with M-I within 300 hundred miles radius of the location where Squyres and Stelly were employed.  As part of their respective agreements, Squyres and Stelly also executed an Employee Invention and

Confidential Information Agreement wherein they also promised not to disclose M-I's confidential information during their employment and thereafter. Squyres executed and agreed to his Employee Invention and Confidential Information Agreement on August 3, 2006 and his Confidentiality Agreement on September 1, 2000. Stelly executed and agreed to his Employee Invention and Confidential Information Agreement on November 5, 2002 and his Confidentiality Agreement on April 14, 1999.

    10.    During their employment at M-I, Squyres and Stelly specialized in the rental and technical support of wellbore cleanout equipment used in downhole drilling operations. Stelly and Squyres promoted and supported tools to M-I's customers throughout the Gulf of Mexico, Texas, Louisiana, and Alabama. M-I provided and entrusted to Squyres and Stelly proprietary Confidential Information, technology, trade secrets, including its customer contacts, customer pricing, tool design, and tool history. M-I provided Squyres and Stelly with specialized training and specialized knowledge in M-I's wellbore tools and technologies, M-I's customers, sales, and its offshore Gulf Coast market. While employed at M-I, Chad Stelly and Stephen Squyres received access to and negotiated M-I's pricing and price discounts with customers, including but not limited to BP p.l.c., Chevron Corporation, Devon Energy Corporation, Exxon Mobil Corporation, Walter Oil and Gas Corporation, Marathon Oil Corporation, and Eni S.p.A.

    11.    M-I also provided to and entrusted Stelly and Squyres with access to nonconformance reports, tool drawings, tool designs, tech units, tool utility reports, scrap reports, job proposals and procedures, sales forecasts, job tracker, customer preferences, tool research and developments and project information, particularly upcoming tool presentations and field trials of new tools ("Confidential Information"). M-I also granted Squyres access to its market strategies, financial records and employee salary information.

166761.1                                3

12.     M-I's customer pricing, preferences and discounts, nonconformance reports, tool drawings and specifications, tool utility reports, scrap reports, job proposals and procedures, sales forecasts, tool research and development information, market strategies, job tracker, financial records, and employee salaries are proprietary information used by M-I in its business. This information gives M-I a competitive advantage. This information is not generally known, and it is not discoverable by inspection. M-I takes steps to keep this information secret. Employees are required to sign trade secret and confidential information agreements, and this information is stored on M-I's intranet where it is password protected. M-I allows access to this information to some of its employees because this access is necessary for those employees to perform their job duties. This information is valuable to M-I, and it would be valuable to M-I's competitors, such as WES, if they obtain it. M-I spent considerable amounts of time and money to create this information. This information is M-I's institutional knowledge and history of its wellbore cleanout tool business. It is the product of many years of experience, dozens of skilled employees' labor, and millions of dollars spent in research, testing and application.

13.     Despite receiving the above consideration, Squyres and Stelly quit M-I to work for WES. WES is an oilfield service company specializing in the sales and rental of wellbore cleaning equipment and services used in downhole cleanout operations. WES is in competition with M-I. Stelly and Squyres are performing the same or similar function for WES that they performed for M-I. In their employment at WES, Stelly and Squyres are now inevitably and unavoidably using and disclosing and continue to use and disclose the aforementioned M-I trade secrets, proprietary Confidential Information, and competing against M-I and soliciting M-I's customers based on the relationships they formed and further developed while at M-I. Stelly has solicited and/or is soliciting and renting competing tools to: BP p.l.c., Chevron Corporation,

Devon Energy Corporation, Exxon Mobil Corporation, Walter Oil and Gas Corporation, Marathon Oil Corporation, and Eni S.p.A. Squyres is soliciting and renting WES tools primarily to BP p.l.c. just as he did while at M-I.

14.     While Squyres worked at M-I, Benton Knobloch, and other employees of WES induced Squyres to quit M-I for increased compensation and/or benefits or a more beneficial employment package, breach his contracts with M-I, and to work for WES.  Squyres terminated his employment on March 24, 2008 and immediately thereafter began to work for WES in Houston, Texas to perform the same or similar job duties for WES that he performed for M-I. While Stelly worked at M-I, Knobloch, Squyres, and other employees of WES induced Stelly to quit M-I for increased compensation and/or benefits or a more beneficial employment package, breach his contracts with M-I, and to work for WES.  After accepting an offer from WES, Stelly gave to M-I his notice of termination on March 9, 2009, quit, and immediately thereafter began to perform the same or similar job duties at WES that he performed for M-I.

15.     Before his termination, Knobloch, Squyres, and other employees of WES, induced Stelly to misappropriate or to inevitably use M-I's technology, Confidential Information and trade secrets for use in WES's business operations.  In the days before he notified M-I that he was quitting, Stelly connected external memory devices to his M-I laptop and transferred files to these devices from the laptop.  A forensic analysis of Stelly's External Hard Drive and USB Drive revealed that M-I's files were on these devices and that some of these files had been transferred from Stelly's laptop.  In addition, on March 8, 2009, Stelly began downloading M-I's files on to his M-I laptop immediately after ending a cell phone conversation with Knobloch. Similarly, on March 6, 2009, Stelly called Knobloch minutes before he plugged in an external memory device to his laptop.  Because this computer activity occurred after Stelly accepted

employment with WES and in close proximity to phone calls with Knobloch, M-I has reason to believe that Stelly was accessing M-I's Confidential Information and files for his and for WES's use. WES would have use for this Confidential Information because it sells or rents tools that compete with M-I's tools. Likewise, Stelly would have use for this Confidential Information because he is doing the same job for WES that he did for M-I.

16.     Defendants, without authorization, have inevitably and unavoidably used and do continue to use and disclose M-I's Confidential Information, including but not limited to: its customer contacts, customer pricing, tool design, and tool history, nonconformance reports, tool drawings, tool utility reports, scrap reports, job proposals and procedures, customer preferences, sales forecasts, job tracker, tool research and developments and project information, particularly upcoming tool presentations and field trials of new tools. Defendants are using this Confidential Information to interfere with M-I's business relationships with its customers. Stelly and Squyres are inevitably and unavoidably using and do use and disclose this Confidential Information in their employment with WES because they are performing the same or similar job duties for WES that they did for M-I and they are calling on the same customers for WES that they did for M-I.

17.     Squyres's and Stelly's conduct also violates their said Confidentiality Agreements with Global Completion Services, Inc. ("GCS") wherein they promised not to disclose GCS' or SPS' Confidential Information. M-I acquired these contractual rights in its transaction with SPS.

18.     Knobloch's conduct violates the contracts that he executed with Specialised Petroleum Services International, Inc. f/k/a Global Completion Services, Inc. ("SPS/GCS"), then a subsidiary of SPS Petroleum Services Group Limited ("SPS"). M-I acquired SPS and SPS/GCS on or around August 2, 2006. On or around August 2, 2006, SPS/GCS assigned to M-I all its property of every kind including its contractual rights, including those arising out of the

contracts with Knobloch and Squyres, as part of an Asset Purchase Agreement between M-I and SPS/GCS. In both his Employment Agreement dated June 11, 2001 and Confidentiality Agreement dated June 28, 2001, Knobloch promised not to use or disclose SPS/GCS's Confidential Information. In his Employment Agreement, Knobloch also promised not to solicit SPS/GCS's customers, interfere with SPS/GCS's customer relationships, or compete with SPS/GCS. Knobloch emailed his resignation to M-I on August 21, 2006, and his employment with M-I was thereafter terminated. However, M-I retained the rights including the contract rights assigned to it by SPS/GCS including those rights in Knobloch's Employment Agreement and Confidentiality Agreement. On and before August 31, 2006. Knobloch prepared and engaged in organizational activities of WES and began setting up an operation in competition with M-I. On August 31, 2006, Knobloch, in continued violation of his Employment Agreement, in organizing and planning Defendant WES, continued his plan to carry out competing against SPS/GCS and M-I in the same region, began soliciting SPS/GCS's customers and interfering with SPS/GCS's customer relationships, and solicited SPS/GCS's employees (who then worked for M-I) to breach their employment agreements, to quit SPS/GCS and M-I to work for WES.

19. SPS/GCS and M-I gave Knobloch access to its Confidential Information. In particular Knobloch had access to SPS/GCS's tool designs, tool history, nonconformance reports, tool research and development, project information, budgets, revenue, expenditures, marketing plans, customer contact information, customer preferences, customer presentations, proposals to customers, and other proprietary and Confidential Information. This information was used by SPS/GCS in its business, and was and is now used by M-I in its tool business. This information is not generally known, and it is not discoverable by inspection. This information

gave SPS/GCS and gives M-I a competitive advantage as it would give most possessors in the industry.  GCS/SPS and M-I took steps to keep this information secret.  SPS/GCS required employees to sign confidentiality agreements and vendors to sign licensing agreements with confidentiality clauses.  M-I takes similar steps to keep this information secret.  Employees are required to sign trade secret and confidential information agreements, and this information is stored on M-I's intranet which is password protected.  M-I allows access to this information to some of its employees because this access is necessary for those employees to perform their duties. This Confidential Information was valuable to SPS/GCS and was and is valuable to M-I, and it would be valuable to SPS/GCS and M-I's competitors, such as WES, if they obtain it.  SPS/GCS spent considerable amounts of time and money to create this information and develop it.  M-I spent a substantial amount of money to obtain the rights to this information.  This information is SPS/GCS's and M-I's institutional knowledge and history of its wellbore cleanout tool business.  It is the product of many years of experience, dozens of skilled employees' labor, and millions of dollars spent.  M-I believes that Knobloch has used and is using, and has disclosed and is disclosing this Confidential Information to form and operate WES to the harm of SPS/GCS and M-I.

20.     Knobloch, Stelly, Squyres, Phillip Morgan, Todd Roy and other former M-I employees at WES, received access to M-I's tool design, technology, drawings and specifications, especially the SPS and GCS tools which were acquired by M-I in 2006.  In addition, Knobloch, as Manager of Sales for the Americas and Caribbean, had access to the same types of Confidential Information and trade secrets that Squyres did as Regional Sales Manager.

21.     WES's tools and M-I's tools have the same or similar purpose, function and use. M-I believes that WES obtained tools similar to certain of M-I's tools which have the same

function, use, and purpose by using M-I's Confidential Information, specifications and/or design as found in M-I's engineered drawings, specifications, and technical units including those developed by SPS and GCS that were acquired by M-I. It is believed that WES used M-I's designs and technologies of the following tools: Short Trip Jetting Sub, PosiDrift Sub, Pup Riser Brush, Magno Back CCT, Razorback, Bristle Back, Well Patroller, Well Commissioner, Standard MFCT-C or Heavy Duty MFCTC, Pup Finger Basket, Quick Trip Junk Basket, Extended Pup Junk Catcher, Single Action Bypass Sub, Well Scavenger, and the foregoing tools' variants and predecessors. It is believed that WES used these designs in the conception and design of the following WES tools: Clean WellTM Drill TechTM, Clean WellTM Bristle TechTM, Clean WellTM Inflow TechTM, Clean WellTM Vali TechTM, Clean WellTM Turbo TechTM, Clean WellTM Tru DriftTM, Clean WellTM Riser Bristle TechTM, Casing Vor TechTM Junk Bucket, Clean WellTM Mag TechTM, Clean WellTM Jet TechTM, Clean WellTM Jet Sub, and Vac Tech.

22.     M-I's tool designs and technology are proprietary information used by M-I in its business. This Confidential Information gives M-I a competitive advantage. This information is not generally known, and it is not discoverable by inspection. M-I takes steps to keep this information secret. Employees are required to sign trade secret and confidential information agreements, and this information is stored on M-I's intranet which is password protected. M-I allows certain access to this information to some of its employees because this access is necessary for those employees to perform their job duties. This information is valuable to M-I, and it would be valuable to M-I's competitors, such as WES if they obtain it. M-I spent considerable amounts of time and money to research and develop this information and keep it secret. M-I employs engineers and designers to research and develop these tool designs. These

166761.1                                    9

designers and engineers take years to research and develop a tool, and it takes substantial additional time and money to test and market these tools.

23.     In less than a year after its formation, WES had designed, manufactured, tested and marketed wellbore clean out tools similar to certain M-I's tools.  WES used BlueLine and others who were the same manufacturers as SPS and/or M-I used.

24.     As part of M-I's acquisition of SPS, M-I acquired GCS and SPS Employment Agreements and Confidentiality Agreements with Knobloch, Squyres and many other employees that WES has raided.  In addition, M-I entered into a Trade Secret Agreement and Covenant Not Compete and Employee Invention and Confidential Information Agreement with these raided employees.  Knobloch was Manager of Sales for the Americas when he quit M-I.  Knobloch resigned from M-I and immediately formed WES, and began serving as its President on September 1, 2006.  Within two weeks, WES, and its agents, and Knobloch induced Todd Roy to quit M-I and join WES.

25.     In 2007, WES and its agents raided three more M-I employees, Phillip Morgan, M-I's Senior Applications Engineer; Shawna Richard-Landry, M-I's Operations Clerk; and Mark Lagrange, a Shop Technician who also had a Confidentiality Agreement with M-I.  Each of these three employees were bound by M-I's Trade Secret Agreement and Covenant Not to Compete Employee Invention and Confidential Agreement.  Each of these employees worked at and/or continues to work at WES in violation of their contracts with M-I.

26.     In 2008, WES and its agents raided more M-I employees: Donald Turner, a Shop Technician; Nick Briscoe, an SPS Tool Service Specialist; Kevin Squyres, an SPS Tool Service Specialist; Scott Leger, a Shop Technician; Jerry Lanthier, an SPS Tool Service Specialist; Josh

Cormier, an SPS Tool Service Specialist; Kevin Duhon, assembly shop technician; and Stephen Squyres, M-I's Sales Manager.

27.     On March 3, 2009, Knobloch induced Stelly to breach his employee agreement with M-I. Before he quit, Stelly told WES and Knobloch that Stelly had a noncompete agreement with M-I. WES and Knobloch willfully disregarded that M-I contract just as it had disregarded the previously raided employees' contracts with M-I and as it has continued to disregard them. On March 11, 2009, Stelly's job assignment at WES was to support WES's "Clean Well Products" in the Gulf of Mexico. These Clean Well Products are identified as particular tools in WES's catalogue. The Clean Well tools are competing with M-I's tools.

28.     Knobloch and WES induced each of aforementioned employees and possibly others to quit M-I for increased compensation and/or other benefits or a total increased employment package. Each have competed and/or continue to compete against M-I in violation of their contracts with M-I. WES and Knobloch knew and/or had reason to know of these former employees' contracts with M-I, especially the Trade Secret Agreement and Covenant Not to Compete.

29.     The Defendants' misappropriation, breaches of contract, and interference has caused M-I substantial harm. M-I has learned that it lost at least one well to WES when BP awarded the ThunderHorse Project 778 #2 Well to WES instead of M-I because of Squyres's sales efforts.   M-I has provided Wellbore cleanout tools and services to BP for other ThunderHorse wells, and expected to provide the same for 778 #2. Defendants have unfairly competed and continue to unfairly compete with M-I on other projects using M-I's former employees and M-I's Confidential Information. WES was awarded the ThunderHorse 778 #2 because of Squyres's breach of his contracts with M-I, WES's interference with those contracts,

the inevitable use and disclosure of and continued use of M-I's Confidential Information, and the use of M-I's tool designs.

30.     Defendants have so far refused to produce requested records necessary to further specify M-I's damages for Defendants' contractual violations and tortious conduct.  M-I will amend its pleading after receipt and review of the WES records, if necessary.

## IV.  CAUSES OF ACTION

**Count 1 - Breaches of Trade Secret Agreement and Covenant Not to Compete: Squyres and Stelly**

31.     All previous paragraphs are incorporated herein by reference.

32.     The Trade Secret Agreement and Covenant Not to Compete executed and agreed to by Stelly and Squyres includes a covenant not to compete.  This covenant precludes Stelly and Squyres from competing against M-I in the territory in which they were employed at M-I for a period of two (2) years as to customers they worked with at M-I.  The Trade Secret Agreement and Covenant Not to Compete executed by Stelly and Squyres also include Stelly and Squyres's respective promises not to disclose or use M-I's Confidential Information and trade secrets.

33.     The Trade Secret Agreement and Covenant Not to Competes are enforceable under Texas law.  Stelly and Squyres's promises in these agreements were each made in exchange for M-I's promises to provide them with specialized knowledge and training, M-I's trade secrets, M-I's Proprietary Confidential Information, and M-I's goodwill.  M-I fulfilled each of these promises with respect to Stelly and Squyres.  Each of the covenants arise out of the trade secret agreement because the covenant is (1) designed to protect: M-I's trade secrets, M-I's confidential and proprietary information, M-I's goodwill, and the specialized training and

knowledge M-I provided to Stelly and Squyres and (2) to enforce Stelly and Squyres's promises regarding the same.

34. Stelly and Squyres's covenants not to compete have reasonable time, territory, and activity limitations. The covenants' limitations do not impose greater restraint than necessary to protect M-I's business interests; and M-I does not seek to enforce the covenants in any unreasonable manner or to any unreasonable extent.

35. Stelly and Squyres breached their covenants not to compete against M-I. Stelly and Squyres are in competition against M-I within the same territory that they worked for M-I and with the same customers. Stelly and Squyres are employed at WES in and around generally the same territory that Stelly and Squyres worked in for M-I, and Stelly and Squyres are performing the same or similar functions for WES that they did with M-I. Stelly and Squyres are soliciting and renting tools on behalf of WES to M-I's former customers.

36. In addition, upon information and belief, Stelly and Squyres violated their Trade Secret Agreement and Covenant Not to Compete by divulging, disclosing and using trade secrets and/or proprietary Confidential Information. During their employment with M-I, M-I provided Stelly and Squyres with trade secrets and proprietary Confidential Information. The aforementioned trade secrets and proprietary Confidential Information provided to Stelly and Squyres are proprietary information used by M-I in its business. This information gives M-I a competitive advantage. This information is not generally known, and it is not discoverable by inspection. M-I takes steps to keep this information secret. Employees are required to sign trade secret and confidential information agreements, and this information is stored on M-I's intranet which is password protected. M-I allows access to this information to some of its employees because this access is necessary for those employees to perform their duties. This information is

valuable to M-I, and it would be valuable to M-I's competitors, such as WES, if they obtain it. M-I spent considerable amounts of time and money to create this information. This information is M-I's institutional knowledge and history of its wellbore cleanout tool business. It is the product of many years of experience, dozens of skilled employees' labor, and millions of dollars spent. Upon information and belief, Stelly and Squyres appropriated and are using and disclosing to WES the aforementioned M-I's trade secrets and proprietary Confidential Information in their employment with WES.

37.     The above breaches were and are material. As a natural, probable, and foreseeable consequence and proximate cause of Stelly and Squyres's breaches, M-I has suffered and continues to suffer damages for which Stelly and Squyres are liable. M-I has or will suffer an amount of damages to its business in the form of lost profits, loss of customers and loss of future business opportunities and goodwill. M-I seeks to recover all special, general, consequential, actual, and exemplary damages allowed by law as well as attorney fees, court costs, prejudgment, and postjudgment interest. With respect to Stelly's and Squyres's breaches of the Trade Secret Agreement, M-I seeks damages based on the value of misappropriated trade secrets when they were misappropriated; the diminution in the value of M-I's trade secrets to M-I as a result of the misappropriation and disclosure by Defendants; the lost profits M-I has suffered as a result of Defendants' misappropriation, the disgorgement of Defendants' profits associated with the use of M-I's trade secrets, a reasonable royalty which the Defendants would have been willing to pay and M-I would have been willing to accept for the use of M-I's trade secrets; and Defendants' "unjust enrichment" resulting from the misappropriation of M-I's trade secrets. Unjust enrichment includes the following: (1) Defendants' profits resulting from the use of the trade secrets; (2) Defendants' profits on sales made possible by product development

which was accelerated by the misappropriation of the trade secrets; and/or (3) avoided development costs resulting from the misappropriation. In addition, M-I is entitled to injunctive relief to prevent all such imminent and irreparable harm for which it has no adequate remedy at law. Stelly and Squyres have agreed that M-I is entitled to such injunctive relief in these very circumstances in their contracts. See Employee Invention and Confidential Information Agreements ¶9

38.     Defendant Stelly further expended funds and obtained reimbursement therefor from M-I contrary to the stated policies of M-I with respect to expenses for which M-I would allow reimbursement. M-I seeks recovery of those funds. M-I seeks to recover all damages allowed by law as well as court costs, prejudgment interest, and postjudgment interest.

## Count 2 - Breaches of Employee Invention and Confidential Information Agreements: Stelly and Squyres

39.     All previous paragraphs are incorporated herein by reference.

40.     Stelly and Squyres violated their Employee Invention and Confidential Information Agreements by divulging or inevitably using and continuing to use trade secrets, and proprietary Confidential Information. During their employment with M-I, M-I provided to Stelly and Squyres the aforementioned trade secrets and proprietary Confidential Information. The aforementioned trade secrets and proprietary Confidential Information provided to Stelly and Squyres are proprietary information used by M-I in its business. This information gives M-I a competitive advantage. This information is not generally known, and it is not discoverable by inspection. M-I takes steps to keep this information secret. Employees are required to sign trade secret and confidential information agreements, and this information is stored on M-I's intranet which is password protected. M-I allows access to this information to some of its employees

because this access is necessary for those employees to perform their job duties. This information is valuable to M-I, and it would be valuable to M-I's competitors, such as WES, if they obtain it. M-I spent considerable amounts of time and money to create this information. This information is M-I's institutional knowledge and history of its wellbore cleanout tool business. It is the product of many years of experience, dozens of skilled employees' labor, and millions of dollars spent. Upon information and belief, Stelly and Squyres appropriated and are inevitably using or disclosing and continue to use and disclose the aforementioned M-I trade secrets and proprietary Confidential Information in their employment with WES.

41. The above breaches were material. As a natural, probable, and foreseeable consequence and proximate cause of Stelly and Squyres's breaches, M-I has suffered and continues to suffer damages for which Stelly and Squyres are liable. M-I has or will suffer damages to its business in the form of lost profits, loss of customers and loss of future business opportunities and goodwill. M-I seeks to recover all special, general, consequential, actual, and exemplary damages allowed by law as well as attorney fees, court costs, prejudgment interest, and postjudgment interest. In particular, M-I seeks damages based on the value of misappropriated trade secrets when they were misappropriated; the diminution in the value of M-I's trade secrets to M-I as a result of the misappropriation and disclosure by Defendants; the lost profits M-I has suffered as a result of Defendants' misappropriation, the disgorgement of Defendants' profits associated with the use of M-I's trade secrets, a reasonable royalty which the Defendants would have been willing to pay and M-I would have been willing to accept for the use of M-I's trade secrets; and Defendants' "unjust enrichment" resulting from the misappropriation of M-I's trade secrets. Unjust enrichment includes the following: (1)

Defendants' profits resulting from the use of the trade secrets; (2) Defendants' profits on sales made possible by product development which was accelerated by the misappropriation of the trade secrets; and/or (3) avoided development costs resulting from the misappropriation. In addition to these damages, M-I seeks permanent injunctive relief to prevent all such irreparable harm in the future for which it has no adequate remedy at law. Stelly and Squyres have agreed that M-I is entitled to such injunctive relief in these very circumstances in their contracts. *See* Employee Invention and Confidential Information Agreements at ¶9.

### Count 3 - Common Law Misappropriation of Trade Secrets: Knobloch, WES, Stelly and Squyres

42.     All previous paragraphs are incorporated herein by reference.

43.     During the course of their respective employments with M-I, Stelly and Squyres had access to M-I's trade secrets and proprietary Confidential Information. In addition to their agreements, given the highly competitive industry and confidential nature of the information given to Stelly and Squyres, Stelly and Squyres had a confidential relationship with M-I which gave rise to certain fiduciary obligations.

44.     The aforementioned trade secrets, and proprietary Confidential Information provided to Stelly and Squyres are proprietary information used by M-I in its business. This information gives M-I a competitive advantage. This information is not generally known, and it is not discoverable by inspection. M-I takes steps to keep this information secret. Employees are required to sign trade secret and confidential information agreements, and this information is stored on M-I's intranet which is password protected. M-I allows access to this information to some of its employees because this access is necessary for those employees to perform their duties. This information is valuable to M-I, and it would be valuable to M-I's competitors, such

as WES, if they obtain it. M-I spent considerable amounts of time and money to create this information. This information is M-I's institutional knowledge and history of its wellbore cleanout tool business. It is the product of many years of experience, dozens of skilled employees' labor, and millions of dollars spent.

45. Upon information and belief, Stelly, Knobloch, Squyres and WES are using and disclosing and continue to use and disclose M-I's Confidential Information and trade secrets. Defendants are believed to now be using these trade secrets and Confidential Information to unfairly compete with M-I.

46. SPS/GCS gave to Knobloch as well as the other Defendants access to its trade secrets and Confidential Information. In particular Knobloch had access to SPS/GCS's tool designs, tool history, nonconformance reports, tool research and development, project information, budgets, revenue, expenditures, marketing plans, customer contact information, customer presentations, customer preferences, proposals to customers, and other trade secret information. This information was used by SPS/GCS in its business, and it was and is now used by M-I in its business. This information is not generally known, and it is not discoverable by inspection. This information gave SPS/GCS and M-I a competitive advantage. GCS/SPS and M-I took steps to keep this information secret. SPS/GCS required employees to sign confidentiality agreements and vendors to sign licensing agreements with confidentiality clauses. M-I takes similar steps to keep this information secret. Employees are required to sign trade secret and confidential information agreements, and this information is stored on M-I's intranet which is password protected. M-I allows access to this information to some of its employees because this access is necessary for those employees to perform their duties. This information

was valuable to SPS/GCS and was and is valuable to M-I, and it would be valuable to SPS/GCS and M-I's competitors, such as WES, if they obtain it. SPS/GCS spent considerable amounts of time and money to create this information. M-I spent a substantial amount of money to obtain the rights to this information. This information is SPS/GCS's and M-I's institutional knowledge and history of its wellbore cleanout tool business. It is the product of many years of experience, dozens of skilled employees' labor, and millions of dollars spent. M-I believes that Knobloch has used and disclosed these trade secrets and Confidential Information to form and operate WES and Knobloch through WES continues to use and disclose M-I's trade secrets.

47.     Knobloch, Stelly, Squyres, Phillip Morgan, Todd Roy and other former M-I employees now working for WES, received access to M-I's tool design and technology, and drawings and specifications, especially the SPS and GCS tools which were acquired by M-I in 2006. In addition, Knobloch, as Manager of Sales for the Americas and Caribbean, had access to the same types of Confidential Information and trade secrets that Squyres did as Regional Sales Manager.

48.     WES's tools and M-I's tools have the same or similar purpose, function and use. M-I believes WES manufactured tools similar to certain M-I tools by using M-I's Confidential Information and trade secrets as found in M-I's engineered drawings, specifications, and technical units. It is believed WES used M-I's designs and technologies for the following tools: Short Trip Jetting Sub, PosiDrift Sub, Pup Riser Brush, Magno Back CCT, Razorback, Bristle Back, Well Patroller, Well Commissioner, Standard MFCT-C or Heavy Duty MFCTC, Pup Finger Basket, Quick Trip Junk Basket, Extended Pup Junk Catcher, Single Action Bypass Sub, Well Scavenger, and the foregoing tools' variants and predecessors. It is believed that WES

used these designs in the conception, design, and fabrication of the following WES tools: Clean WellTM Drill TechTM, Clean WellTM Bristle TechTM, Clean WellTM Inflow TechTM, Clean WellTM Vali TechTM, Clean WellTM Turbo TechTM, Clean WellTM Tru DriftTM, Clean WellTM Riser Bristle TechTM, Casing Vor TechTM Junk Bucket, Clean WellTM Mag TechTM, Clean WellTM Jet TechTM, Clean WellTM Jet Sub, and Vac Tech.

49.    M-I's tool designs and technology are proprietary information used by M-I in its business. This Confidential Information gives M-I a competitive advantage. This information is not generally known, and it is not discoverable by inspection. M-I takes steps to keep this information secret. Employees are required to sign trade secret and confidential information agreements, and this information is stored on M-I's intranet which is password protected. M-I allows certain access to this information to some of its employees because this access is necessary for those employees to perform their duties. This information is valuable to M-I, and it would be valuable to M-I's competitors, such as WES if they obtain it. M-I spent considerable amounts of time and money to research and develop this information and keep it secret. M-I employs engineers and designers to research and develop these tool designs. These designers and engineers take several years to research and develop a tool, and it takes substantial additional time to test and market these tools.

50.    In less than a year after its formation, WES had designed, manufactured, tested and marketed wellbore clean out tools similar to certain M-I's tools. WES used BlueLine and others who were the same manufacturers as SPS and M-I used.

51.    M-I has suffered and continues to suffer damages that are a natural, probable, and foreseeable consequence and proximate cause of Defendants' use and disclosure of M-I's trade

secrets and Confidential Information. M-I seeks to recover all special, general, consequential, actual, and exemplary damages allowed by law as well as attorney fees, court costs, prejudgment interest, and postjudgment interest. In particular, M-I seeks damages based on the value of misappropriated trade secrets when they were misappropriated; the diminution in the value of M-I's trade secrets to M-I as a result of the misappropriation and disclosure by Defendants; the lost profits M-I has suffered as a result of Defendants' misappropriation, the disgorgement of Defendants' profits associated with the use of M-I's trade secrets, a reasonable royalty which the Defendants would have been willing to pay and M-I would have been willing to accept for the use of M-I's trade secrets; and Defendants' "unjust enrichment" resulting from the misappropriation of M-I's trade secrets. Unjust enrichment includes the following: (1) Defendants' profits resulting from the use of the trade secrets; (2) Defendants' profits on sales made possible by product development which was accelerated by the misappropriation of the trade secrets; and/or (3) avoided development costs resulting from the misappropriation. In addition to these damages, M-I seeks permanent injunctive relief to prevent all such imminent and irreparable harm in the future.

### Count 4 - Tortious Interference with M-I's Customer Contracts: Knobloch, WES, Stelly and Squyres

52.     All previous paragraphs are incorporated herein by reference.

53.     M-I had valid contracts with certain customers. Defendants knew or had reason to know of these contracts. Defendants have willfully and intentionally interfered with M-I's contracts with its customers and continue to do so.

54.     Defendants' conduct is unjustified and constitutes tortious interference with M-I's customer contracts. As a proximate cause of Defendants' tortious interference, M-I has suffered

and will suffer damages. M-I has or will suffer an amount of damages to its business in the form of lost profits, loss of customers and loss of future business opportunities and goodwill. M-I seeks to recover all special, general, consequential, actual, and exemplary damages allowed by law as well as attorney fees court costs, prejudgment interest, and postjudgment interest. In addition to these damages, M-I seeks permanent injunctive relief to prevent all such imminent and irreparable harm.

## Count 5 - Tortious Interference with Prospective Business Relations: Knobloch, WES, Stelly and Squyres

55.    All previous paragraphs are incorporated herein by reference.

56.    In addition to diverting existing business and interfering with existing contracts, M-I believes that Defendants are intentionally and willfully interfering with M-I's prospective business relationships. Upon information and belief, Defendants are able to accomplish this interference by using Squyres and Stelly's, and other former employees of SPS, GCS and M-I, knowledge and position as former trusted agents of M-I and using M-I's trade secrets and Confidential Information to encourage M-I's current, former, and/or prospective customers to contract with WES instead of M-I. M-I believes that Defendants' intentional interference is causing these customers to cancel, withdraw or transfer their business from M-I to WES. The above conduct by Defendants is independently wrongful and tortious because they are using M-I's trade secrets and Confidential Information and breaching their fiduciary duty to M-I while committing this interference.

57.    Defendants' conduct is unjustified and thus constitutes tortious interference with M-I's prospective business relationships. As a proximate cause of Defendants' tortious interference, M-I has suffered and will suffer damages. M-I has or will suffer an amount of

damages to its business in the form of lost profits, loss of customers and loss of future business opportunities and goodwill. M-I seeks to recover all special, general, consequential, actual, and exemplary damages allowed by law as well as attorney fees, court costs, prejudgment interest, and postjudgment interest. In addition, M-I seeks permanent injunctive relief to prevent all such imminent and irreparable harm.

**Count 6 - Tortious Interference with M-I's Employment Contracts - Knobloch, WES, and Squyres**

58. All previous paragraphs are incorporated herein by reference.

59. M-I had valid contracts with the aforementioned employees that WES induced to quit M-I including but not limited to M-I Trade Secret Agreement and Covenant Not to Compete, M-I Employee Invention and Confidential Information Agreement, GCS and SPS Confidentiality Agreements with respect to the confidentiality and nondisclosure provisions, and/or at-will employment agreements. Knobloch and WES knew or had reason to know of those contracts. Knobloch and WES willfully and intentionally interfered with those contracts.

60. WES and its agents, including Knobloch and Squyres, knew or had reason to know of those contracts, specifically the employment agreement and Trade Secret Agreement and Covenant Not to Compete because Squyres and other WES agents had essentially the same agreements with M-I and WES. WES and its agents willfully and intentionally interfered with the said contracts. WES and its agents induced the former employees to quit M-I and join WES. WES offered them increased compensation and/or other benefits. The said former employees are doing the same duties for WES that they did for M-I. M-I believes that the said employees are using M-I, SPS, and GCS's Confidential Information and trade secrets. The said former

employees have inevitably and unavoidably used and continue to use M-I, SPS, and GCS's confidential information and trade secrets.

61.     M-I has suffered and continues to suffer damages that are a natural, probable, and foreseeable consequence and proximate cause of said Defendants' interference.  M-I has or will suffer an amount of damages to its business in the form of replacement and training costs, lost profits, loss of customers and loss of future business opportunities.  M-I seeks to recover all damages allowed by law as well as attorney fees, court costs, prejudgment interest, and postjudgment interest.  In addition, M-I seeks permanent injunctive relief to prevent all such imminent and irreparable harm.

### Count 7 - Breach of Fiduciary Duty: Stelly, Squyres, and Knobloch

62.     All previous paragraphs are incorporated herein by reference.

63.     Stelly, Squyres and Knobloch and agents of WES, former employees of M-I, each owed to M-I a fiduciary duty.  This fiduciary duty survives termination of employment with M-I.  This fiduciary duty includes, among other things, a duty not to: (1) misappropriate M-I's trade secrets and Confidential Information; (2) solicit M-I customers while still working for M-I; (3) solicit the departure of other M-I employees while still working for M-I; or (4) form a competing enterprise.

64.     Upon information and belief, Knobloch, Stelly and Squyres and agents of WES breached their respective fiduciary duties to their benefit by appropriating M-I's trade secrets and Confidential Information, soliciting M-I customers, and/or soliciting or obtaining the departure of other M-I employees.  Further Knobloch breached his fiduciary duty to M-I by forming and organizing and fostering a competing enterprise while employed with M-I.

65.     M-I has suffered and continues to suffer damages that are a natural, probable, and foreseeable consequence and proximate cause of Stelly's, Squyres's and Knobloch's and agents of WES breach of fiduciary duty.  M-I has or will suffer an amount of damages to its business in the form of lost profits, loss of customers and loss of future business opportunities and goodwill. M-I seeks to recover all special, general, consequential, actual, and exemplary damages allowed by law as well as attorney fees, court costs, prejudgment interest, and postjudgment interest.  For Defendants' misappropriation of M-I's trade secrets, M-I seeks damages based on the value of misappropriated trade secrets when they were misappropriated; the diminution in the value of M-I's trade secrets to M-I as a result of the misappropriation and disclosure by Defendants; the lost profits M-I has suffered as a result of Defendants' misappropriation, the disgorgement of Defendants' profits associated with the use of M-I's trade secrets, a reasonable royalty which the Defendants would have been willing to pay and M-I would have been willing to accept for the use of M-I's trade secrets; and Defendants' "unjust enrichment" resulting from the misappropriation of M-I's trade secrets.   Unjust enrichment includes the following: (1) Defendants' profits resulting from the use of the trade secrets; (2) Defendants' profits on sales made possible by product development which was accelerated by the misappropriation of the trade secrets; and/or (3) avoided development costs resulting from the misappropriation.   In addition, M-I seeks permanent injunctive relief to prevent all such imminent and irreparable harm in the future.

## Count 8 - Texas Theft Liability Act:  Knobloch, WES, Stelly and Squyres

66.     All previous paragraphs are incorporated herein by reference.

67.     M-I had and has a possessory right to its trade secrets and Confidential Information.   Upon information and belief Defendants unlawfully appropriated M-I's trade secrets and Confidential Information under Texas Penal Code section 31.05.   Defendants' unlawful appropriation was made with the intent to deprive M-I of its trade secrets and Confidential Information.

68.     As a result of Defendants' wrongful conduct, M-I has suffered and continues to suffer damages.   Upon proof of actual damages, plaintiff is entitled to additional statutory damages of $1,000 from Defendants under Texas Civil Practice & Remedies Code section 134.005(a)(1).

69.     Defendants have unlawfully obtained, used, and taken M-I's Confidential Information in violation of agreements and Texas law.   As a result, under the Texas Theft Liability Act, Defendants are liable for damages caused as a result of the unlawful appropriation, including punitive damages.   M-I seeks to recover all special, general, consequential, actual, and exemplary damages allowed by law as well as attorney fees, court costs, prejudgment interest, and postjudgment interest.   In addition, M-I seeks permanent injunctive relief to prevent all imminent and irreparable harm for which it has no adequate remedy at law.

**Count 9 – Conspiracy:  Knobloch, WES, Stelly and Squyres**

70.     All previous paragraphs are incorporated herein by reference.

71.     Defendants have secretly and intentionally conspired, agreed and endeavored to deprive M-I of its trade secrets and Confidential Information, current and prospective business agreements and advantages and business goodwill.  This conspiracy has proximately caused M-I to suffer damages.

72.     Defendants, agreed to interfere with M-I's contracts with M-I's past, current, and prospective customers, and they agreed to misappropriate M-I's trade secrets. Defendants knew that this interference and misappropriation would result in harm to M-I.

73.     M-I has suffered, and continues to suffer, damages that are proximately caused by Defendants' conspiracy to interfere with M-I's contracts with its current, former, and prospective customers and misappropriate M-I's trade secrets and Confidential Information. M-I has or will suffer an amount of damages to its business in the form of lost profits, loss of customers and loss of future business opportunities. M-I seeks to recover all special, general, consequential, actual, and exemplary damages allowed by law as well as court costs, prejudgment interest, and postjudgment interest. In addition to these damages, M-I seeks permanent injunctive relief to prevent further such irreparable harm.

**Count 10 - Unfair Competition By Misappropriation: Knobloch, WES, Stelly and Squyres**

74.     All previous paragraphs are incorporated herein by reference.

75.     M-I developed its tool designs through extensive time, labor, and money. M-I's tools took several years and millions of dollars to create, test and market. These tools were designed and tested by skilled designers and engineers.

76.     The Defendants have used M-I's Confidential Information and tool designs to compete with M-I technology and gaining a special advantage because they did not have to put in the time, labor, skill, and money necessary to create, test and market their competing tools.

77.     As a result, M-I has suffered and continues to suffer damages. M-I has or will suffer an amount of damages to its business in the form of lost profits, loss of customers and loss of future business opportunities and goodwill. M-I seeks to recover all special, general,

consequential, actual, and exemplary damages allowed by law as well as attorney fees, court costs, prejudgment interest, and postjudgment interest.   In particular, for Defendants' misappropriation of M-I's tool designs, M-I seeks damages based on the value of the misappropriated tool designs when they were misappropriated; the diminution in the value of M-I's tool designs to M-I as a result of the misappropriation and disclosure by Defendants; the lost profits M-I has suffered as a result of Defendants' misappropriation, the disgorgement of Defendants' profits associated with the use of M-I's tool designs, a reasonable royalty which the Defendants would have been willing to pay and M-I would have been willing to accept for the use of M-I's tool designs; and Defendants' "unjust enrichment" resulting from the misappropriation of M-I's tool designs.   Unjust enrichment includes the following: (1) Defendants' profits resulting from the use of the tool designs; (2) Defendants' profits on sales made possible by product development which was accelerated by the misappropriation of the tool designs; and/or (3) avoided development costs resulting from the misappropriation.   In addition to these damages, M-I seeks permanent injunctive relief to prevent all such imminent and irreparable harm in the future.

### Count 11 - The Computer Fraud and Abuse Act - 18 U.S.C. § 1030:  Knobloch, WES, Stelly and Squyres

78.     All previous paragraphs are incorporated herein by reference.

79.     M-I's computers are used in interstate commerce, thus M-I's computers are protected computers pursuant to 18 U.S.C. ' 1030 (e)(2)(B).

80.     Defendants knowingly and with intent to defraud, accessed and used the computer(s) assigned to by M-I, without authorization or in a manner exceeding any authorization they may claim that they had.  By means of such conduct, Defendants furthered the intended fraud.

166761.1                                                    28

81.     M-I believes that, because of Stelly's activities in March 2009, Defendants used M-I's computer to misappropriate, use, and share M-I's trade secrets and proprietary Confidential Information without authorization.

82.     M-I has suffered, and continues to suffer, damages that are proximately caused by Defendants' abusive and fraudulent conduct.  M-I has or will suffer an amount of damages to its business in the form of lost profits, loss of customers and loss of future business opportunities. M-I seeks to recover all special, general, consequential, actual, and exemplary damages allowed by law as well as attorney fees, court costs, prejudgment interest, and postjudgment interest.  In addition, M-I seeks permanent injunctive relief to prevent further such irreparable harm.

**Count 12 – Conversion:  Knobloch, WES, Stelly and Squyres**

83.     All previous paragraphs are incorporated herein by reference.

84.     Defendants have taken and/or used, without permission, information and other property from M-I.  Defendants are unlawfully and without authority asserting dominion and control over M-I's trade secrets, proprietary Confidential Information in a manner inconsistent with M-I's rights.

85.     M-I has suffered, and continues to suffer, damages that are proximately caused by Defendants' conversion of its property, trade secrets, and proprietary Confidential Information. M-I has or will suffer an amount of damages to its business in the form of lost profits, loss of customers and loss of future business opportunities.  M-I seeks to recover all special, general, consequential, actual, and exemplary damages allowed by law as well as court costs, prejudgment interest, and postjudgment interest.  In addition, M-I seeks permanent injunctive relief to prevent further such irreparable harm.

**Count 13 – Breaches of Employment and Confidentiality Contracts: Knobloch**

86.     All previous paragraphs are incorporated herein by reference.

87.     The Employment Agreement and the Confidentiality Agreement are both valid and enforceable contracts to which Knobloch agreed. M-I purchased and received by assignment all the rights and obligations of those contracts when it acquired the SPS entities.

88.     Knobloch has breached and continues to breach these contracts. Knobloch breached and continues to breach the contracts by using and disclosing SPS/GCS's Confidential Information. Further, Knobloch has breached the Employment Agreement by forming and operating WES, competing and soliciting SPS/GCS employees and customers within six months of his termination at M-I.

89.     Knobloch's breaches were material. As a natural, probable, and foreseeable consequence and proximate cause of Knobloch's breaches, M-I has suffered and continues to suffer damages. In particular, M-I has or will suffer an amount of damages to its business in the form of lost profits, loss of customers and loss of future business opportunities. M-I seeks to recover all damages allowed by law as well as attorney fees, court costs, prejudgment interest, and postjudgment interest. In particular, for Knobloch's misappropriation of M-I's trade secrets, M-I seeks damages based on the value of misappropriated trade secrets when they were misappropriated; the diminution in the value of M-I's trade secrets to M-I as a result of the misappropriation and disclosure by Knobloch; the lost profits M-I has suffered as a result of Knobloch's misappropriation, the disgorgement of Knobloch's profits associated with the use of M-I's trade secrets, a reasonable royalty which the Knobloch would have been willing to pay and M-I would have been willing to accept for the use of M-I's trade secrets; and Knobloch's "unjust enrichment" resulting from the misappropriation of M-I's trade secrets. Unjust enrichment

includes the following: (1) Knobloch's profits resulting from the use of the trade secrets; (2) Knobloch's profits on sales made possible by product development which was accelerated by the misappropriation of the trade secrets; and/or (3) avoided development costs resulting from the misappropriation.   In addition, M-I seeks permanent injunctive relief to prevent further such irreparable harm.   Knobloch has agreed that M-I is entitled to such injunctive relief and consented thereto. *See* Confidentiality Agreement at ¶ 2.

**Count 14 - Squyres's and Stelly's Breach of GCS/SPS Confidentiality Agreement**

90.   All previous paragraphs are incorporated herein by reference.

91.   In the alternative to the contracts described in Count 1, M-I seeks to enforce the Confidentiality Agreement against Squyres and Stelly.

92.   Upon information and belief, Squyres and Stelly violated the nondisclosure provisions within the Confidentiality Agreement by divulging trade secrets and/or proprietary Confidential Information.   During their respective employment with SPS and GCS, SPS and GCS provided Squyres and Stelly with the aforementioned trade secrets and proprietary Confidential Information. Upon information and belief, Squyres and Stelly are using and disclosing this information in their employment with WES.

93.   The above breaches were material.   As a natural, probable, and foreseeable consequence and proximate cause of Squyres's breaches, M-I has suffered and continues to suffer damages for which Squyres and Stelly are liable.   M-I has or will suffer an amount of damages to its business in the form of lost profits, loss of customers and loss of future business opportunities and goodwill.   M-I seeks to recover all special, general, consequential, actual, and exemplary damages allowed by law as well as attorney fees, court costs, prejudgment interest,

and postjudgment interest. In particular, for Defendants' misappropriation of M-I's trade secrets, M-I seeks damages based on the value of misappropriated trade secrets when they were misappropriated; the diminution in the value of M-I's trade secrets to M-I as a result of the misappropriation and disclosure by Defendants; the lost profits M-I has suffered as a result of Defendants' misappropriation, the disgorgement of Defendants' profits associated with the use of M-I's trade secrets, a reasonable royalty which the Defendants would have been willing to pay and M-I would have been willing to accept for the use of M-I's trade secrets; and Defendants' "unjust enrichment" resulting from the misappropriation of M-I's trade secrets. Unjust enrichment includes the following: (1) Defendants' profits resulting from the use of the trade secrets; (2) Defendants' profits on sales made possible by product development which was accelerated by the misappropriation of the trade secrets; and/or (3) avoided development costs resulting from the misappropriation. In addition, M-I seeks permanent injunctive relief to prevent further such irreparable harm.

## V. ATTORNEY FEES AND INTEREST

94.     Pursuant to TEX. CIV. PRAC. & REM. CODE Sections 38.001, et seq., 18 U.S.C. § 1030, common law, and the contracts with Defendants, Plaintiff is entitled to an award of its reasonable and necessary attorney fees with respect to Defendants for this cause and any appeals. Plaintiff hereby seeks recovery of all such amounts. Plaintiff has complied with all conditions precedent necessary for the recovery of its attorney fees. In addition, Plaintiff seeks interest, as damages, at law and at equity, both pre and post judgment.

95.     All conditions precedent to an outcome favorable to the party represented by the undersigned in this action have been performed, have occurred, or have been waived.

## VI.  EXEMPLARY DAMAGES

96.     The conduct of Defendants, as alleged above, including tortious interference with contract, tortious interference with prospective business relationships, misappropriation and disclosure of trade secrets, Confidential Information, conversion, and civil conspiracy, was aggravated by the kind of willfulness, wantonness and malice for which the law allows for the imposition of exemplary damages.     Moreover, Defendants' wrongdoing was committed knowingly and with a conscience indifference to M-I's rights.  Defendants acted with an intent to harm M-I and their misconduct and tortious interference each were intentional, willful, wanton and without justification or excuse.  Therefore, M-I seeks to recover exemplary damages from Defendants, in an amount to be determined by the trier of fact.

## VII.  APPLICATION FOR INJUNCTIVE RELIEF

### Count 16 - Request for Permanent Injunction

97.     All previous paragraphs are incorporated herein by reference.

98.     In addition to the application for preliminary injunction brought in prior pleadings, and the agreed temporary injunction with respect to certain temporary matters recited therein, between some of the parties, and without waiving the same and insisting upon the enforcement thereof, Plaintiff seeks additional and complementary permanent injunctive relief.

99.     M-I requests a Permanent Injunction that Defendants, and each of their agents, servants, representatives, and all other persons or entities in active concert or participation with Defendants who receive actual notice of this Order by personal service or otherwise be and hereby are enjoined as follows:

(a)     Defendants are ordered to return to M-I, and to cease and desist from using, any M-I proprietary documents, electronic files or other property, including but not

limited to M-I's drawings, non-conformance reports, designs, technical manuals, plans, proposals, marketing and sales plans, customer lists, costs and pricing information, sales and market reports, and geologic information or any WES document that uses M-I's information;

(b)     Defendants are restrained from deleting any electronic files from their personal or work computers and/or laptops;

(c)     Defendants are restrained from inducing or attempting to induce, or from causing any person or other entity to induce or attempt to induce, any person who is an employee of M-I to breach a contract with M-I and to leave the employ of M-I;

(d)     Stelly is restrained from the promotion or lease of products or services competitive with those of M-I or providing the same or similar functions for Wellbore Energy Solutions, L.L.C. that he performed for M-I in or within a 300 mile radius of Houston, Texas until March 9, 2011;

(e)     Squyres is restrained from the promotion or lease of products or services competitive with those of M-I or solicitation of business, or attempt to solicit business in products or services sold by M-I, from any customer  or client, or prospective customer or client with whom Squyres dealt or solicited while employed by M-I or providing the same or similar functions for Wellbore Energy Solutions, L.L.C. that he performed for M-I in or within a 300 mile radius of Houston, Texas until March 24, 2010;

(f)     Defendants are ordered to cease and desist from leasing, selling, promoting, or otherwise commercially using: Clean WellTM Drill TechTM, Clean WellTM Bristle TechTM, Clean WellTM Inflow TechTM, Clean WellTM Vali TechTM, Clean WellTM Turbo TechTM, Clean WellTM Tru DriftTM, Clean WellTM Riser Bristle TechTM, Casing Vor TechTM Junk Bucket, Clean WellTM Mag TechTM, Clean WellTM Jet TechTM, Clean WellTM Jet Sub, and Vac Tech or any other tool designed or derived by using M-I's trade secret or confidential infomration.

100.     It is highly probable that M-I will obtain relief from Defendants after a trial on the merits.  Upon information and belief, Defendants misappropriated or inevitably disclosed and continue to disclose and/or use M-I's trade secrets and/or proprietary Confidential Information and have used and disclosed them for the purposes of furthering WES' competition against M-I. Defendants have solicited and continue to solicit such M-I's customers.  Defendants are believed

to continue to solicit M-I's employees to breach contracts with M-I so as to leave M-I and work for WES.

101.    If M-I's Application is not granted, harm is imminent because upon information and belief, Defendants are presently in possession of M-I's trade secrets, proprietary Confidential Information and/or have transmitted M-I's trade secrets, proprietary Confidential Information to others to facilitate their use of that information for their own benefit.    In addition, upon information and belief, Defendants have solicited and continue to solicit M-I's former, current, and/or prospective customers and its employees.    Stelly and Squyres have engaged in competition with M-I in the same territory with the same customers of M-I in which they worked for M-I.    These actions are tortious and violate Knobloch, Stelly, and Squyres's fiduciary duties and/or contractual obligations to M-I.

102.    The harm that will result if the Permanent Injunction is not issued is irreparable and M-I cannot be fully compensated for the harm.    Money cannot fully compensate M-I for the loss of its trade secrets and proprietary Confidential Information, which M-I invests substantial time, money, and human capital resources to develop, and which gives M-I a competitive advantage in the marketplace and which, if used, gives to Defendants a commercial advantage. M-I cannot be fully compensated for the continued loss of its customers and employees to WES. M-I also cannot be fully compensated by the loss of its goodwill that will result from the loss of its trade secrets, proprietary Confidential Information, employees, and business opportunities.

103.    The injury M-I faces outweighs the injury that would be sustained by the Defendants as a result of the injunctive relief.    The injunctive relief sought would not adversely affect public policy or the public interest.

166761.1                                              35

104.   **Bond**.  M-I is willing to post the necessary reasonable bond to facilitate the above injunctive relief requested.

## VIII. CONDITIONS PRECEDENT

105.   All conditions precedent to an outcome favorable to the party represented by the undersigned in this action have been performed, have occurred or have been waived.

## IX. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays for the following relief:

1.   A permanent injunction for the relief requested above;

2.   Upon final trial, judgment against Chad Lee Stelly, Stephen Squyres, Benton Knobloch, and Wellbore Energy Solutions, LLC, jointly and severally, for full permanent injunctive relief as requested herein, and, for the full amount of the Plaintiff's damages, special, general, consequential, actual, and exemplary;

3.   Prejudgment interest;

4.   Postjudgment interest;

5.   The Plaintiff's reasonable and necessary attorney fees in prosecuting its claims through trial and, if necessary appeal;

6.   All costs of suit; and

7.   Such other and further relief, at law or in equity, to which the plaintiff may show itself justly entitled.

Respectfully submitted,

LOOPER REED & McGRAW, P.C.

BY: _____

Ben L. Aderholt
TSB No. 00909000
Joe Virene
TSB No. 24060779

166761.1                              36

1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Tel: (713) 986-7000
Fax: (713) 986-7100

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing has been served on all attorneys of record and persons pro se in this cause, by email, facsimile and/or certified mail, return receipt requested, by depositing same, postpaid, in an official depository under the care and custody of the United States Postal Service on_____5-17-10

BEN L. ADERHOLT