UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| M-I LLC, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL ACTION NO. 4:09-cv-1552 |
| § | |
| CHAD LEE STELLY ET AL., § | |
| § | |
| Defendants. § | |

## MEMORANDUM AND ORDER

Pending before the Court is Plaintiff M-I LLC's Amended Motion to Disqualify BoyarMiller as Counsel (Doc. No. 153). After considering the parties' filings, all responses and replies thereto, and the applicable law, the Court finds that the Plaintiff's motion should be denied.

### I.     BACKGROUND

This suit involves the alleged misappropriation of trade secrets and violation of non-compete agreements by former employees of Plaintiff M-I LLC ("M-I"), including Chad Stelly and Stephen Squyres ("Stelly and Squyres" or "Defendants"), two of the Defendants in this case. Stelly and Squyres both left M-I to work for a rival company, Wellbore Energy Solutions ("WES"). M-I alleges that both employees misappropriated M-I's trade secrets for use in WES's business operations.

Craig Dillard and Michael Perez of BoyarMiller, PC ("B&M") represent Defendants Stelly and Squyres in this matter. Gary W. Miller ("Miller"), the chairman of the business group at B&M, formerly represented two entities acquired by Plaintiff M-I. First, Miller and B&M represented Global Completion Services ("GCS") in its merger

1

with SPS-AFOS International ("SPS"). Miller and B&M then served as local counsel to SPS until August 2006. In August 2006, M-I acquired SPS.

On the basis of these relationships, Plaintiff has filed a motion to disqualify Stelly and Squyres' counsel, B&M. Plaintiff asserts that B&M owes a duty of confidentiality and loyalty to M-I as a former client. Because Miller and B&M formerly represented entities now owned by M-I, Plaintiff asserts it enjoys an imputed attorney-client relationship with B&M; thus, B&M may not now represent adverse parties Stelly and Squyres.

In an earlier order on the same issue, the Court found that it did not have enough information to conduct the "'painstaking analysis'" required under controlling Fifth Circuit law for motions seeking disqualification. (Order, Doc. No. 142, at 2.) The Court ordered a supervised deposition of Miller, which took place on December 22, 2009.

## II.   STANDARD

The Local Rules of the Southern District of Texas provide that "the minimum standard of practice shall be" the Texas Disciplinary Rules of Professional Conduct ("Texas Rules"), although "the court is not limited by that code." LOCAL R. OF THE U.S. DIST. CT. FOR THE S. DIST. OF TEX., app. A, R. 1A-B. The "Texas Rules . . . are not the sole authority governing a motion to disqualify." *In re American Airlines, Inc.*, 972 F.2d 605, 610 (5th Cir. 1992) (internal quotations omitted) (citing *In re Dresser Indus.*, 972 F.2d 540, 543 (5th Cir. 1992)), *cert. denied sub nom. Northwest Airlines, Inc. v. American Airlines, Inc.*, 507 U.S. 912 (1993). In reviewing a motion to disqualify, the Fifth Circuit also "consider[s] . . . the ethical rules announced by the national profession

in light of the public interest and the litigants' rights," including the ABA Model Rules of Professional Conduct ("ABA Rules"). *Id.*

Motions to disqualify are "'substantive motions affecting the rights of the parties and are determined by applying standards developed under *federal law*.'" *Id.* (emphasis in original) (citing *Dresser*, 972 F.2d at 543). That is, though federal courts may adopt federal or state professional responsibility standards, "whether and how these rules are to be applied are questions of federal law." *Id.* Thus, the Texas Rules do not constrain the discretion of this Court, although they provide a useful starting point.

### III.   ANALYSIS

#### A.  Texas Rule 1.09

Plaintiff is seeking to disqualify B&M based on Texas Rule 1.09, which states, in relevant part:

> (a) Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client:
>
>     . . .
>
>     (3) if it is the same or a substantially related matter.
>
> (b) Except to the extent authorized by Rule 1.10, when lawyers are or have become members of or associated with a firm, none of them shall knowingly represent a client if any one of them practicing alone would be prohibited from doing so by paragraph (a) . . . .

TEX. DISCIPLINARY R. OF PROF'L CONDUCT 1.09, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (Vernon Supp. 2008). Since Texas Rule 1.09 does not "differ materially" from its ABA counterpart,[1] it is appropriate for the Court's analysis to

---

[1] *See* MODEL RULES OF PROF'L CONDUCT R. 1.9 (2009).

3

center on the Texas Rules. *In re American Airlines*, 972 F.2d at 610 (internal quotations omitted) (citing *In re Dresser Indus.*, 972 F.2d 540, 543 (5th Cir. 1992)).

In order to disqualify opposing counsel, M-I "must establish two elements: 1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify, and 2) a substantial relationship between the subject matter of the former and present representations." *American Airlines*, 972 F.2d at 610 (citations omitted).

### 1. Attorney-Client Relationship

It is well settled that "the attorney-client privilege attaches to corporations as well as to individuals." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985). The Supreme Court stated in *Weintraub* that, "when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." 471 U.S. at 349. Corporate deals like a "takeover, merger, loss of confidence by shareholders, or simply normal succession" give new management the ability to assert the privileges enjoyed by old officers and directors. *Id.* In its previous order, the Court outlined two lines of precedent that had developed from the Supreme Court's *Weintraub* ruling. One line of cases holds that, only the corporate deals referenced in *Weintraub* result in a transfer of the attorney-client privilege to a successor corporation. These deals include takeovers, mergers, losses of confidence by shareholders, and normal successions. (Doc. No 142, at 4-5.) The other line of cases adopts a less formalistic rule that "'turns on the practical consequences'" of the transaction. *Id.* (quoting *Soverain Software LLC v. Gap, Inc.*, 340 F. Supp. 2d 760, 763 (E.D. Tex. 2004)). This Court found the so-called "practical consequences" rule to be the more persuasive one.

4

In *Soverain*, Defendant Amazon.com sought to compel production of certain documents from Plaintiff Soverain Software ("Soverain"). Soverain opposed production of the documents, citing attorney-client privilege. The dispute centered on whether Soverain could assert the attorney-client privilege with respect to the documents in question, which contained communications between companies who formerly owned the relevant patents. Soverain had purchased a small portion of the former company's assets, including a software business called Transact. Amazon.com argued that Soverain could not assert the privilege because Soverain was not the corporate successor of the companies. 340 F. Supp. 2d at 762. Soverain replied that it was "effectively the corporate successor" to the Transact business, which qualified it as the successor to the attorney-client relationships related to Transact. The Court held that "[i]f the practical consequences of the transaction result in the transfer of control of the business and the continuation of the business under new management, the authority to assert . . . [the] privilege will follow as well." *Soverain*, 340 F. Supp. 2d at 763. Under the circumstances, the court was "not persuaded" that the transfer of the smaller business to Soverain was merely a transfer of assets. *Id.* Significant to the court was that Soverain not only "acquired certain assets but also . . . continued to operate the Transact business," by selling the Transact product, retaining patents, servicing customers of that product, retaining two inventors of the patents, and launching a new version of Transact. *Id.* Based on this evidence, the court concluded that Soverain was a successor of the Transact business and could assert the attorney-client privilege that attended the business.

Another case analyzed a motion for disqualification under similar conditions.[2] In *Tekni-Plex, Inc. v. Meyner and Landis*, the Court of Appeals of New York held, citing *Weintraub*'s directive, that "where efforts are made to run the pre-existing business entity and manage its affairs, successor management stands in the shoes of prior management and controls the attorney-client privilege with respect to matters concerning the company's operations."  89 N.Y.2d 123, 133 (N.Y. 1996).  In that case, a shell corporation purchased Plaintiff's predecessor corporation.  The shell corporation was the surviving corporation, but the court did not find that to be dispositive of the question.  Following the merger, the business of the predecessor corporation "remained unchanged, with the same products, clients, suppliers and non-managerial personnel." *Id.* at 134.  Under those facts, as a "practical matter," the predecessor corporation had not died.  *Id.* "To the contrary, the business operations of [the predecessor corporation] continued under the new managers.  Consequently, control of the attorney-client privilege with respect to any confidential communications between [defendant law firm] and corporate actors of [the predecessor corporation] concerning these operations passed to the management of [the new company]." *Id.*

With this authority in mind, the Court turns to the corporate acquisitions involved here: first, the merger between GCS and SPS; and second, the acquisition of SPS by M-I.

### a.  GCS-SPS merger

The GCS-SPS merger took place in February 2001.  The parties specifically list the acquisition as a "merger" in multiple places.  (*See, e.g.*, Stock Purchase Agreement

---

[2] Although the case is a New York state case, it analyzed the motion for disqualification under certain factors, two of which are identical to the factors in this case—whether a prior attorney-client relationship existed, and whether the matters were substantially related. *Tekni-Plex v. Meyner and Landis*, 89 N.Y.2d 123, 134 (N.Y. 1996).  The case provides guidance for this Court given the similarity of issues in question.

and Plan of Merger, Doc. No. 116, at 2, M-I 3993; Certificate of Merger, Doc. No. 150, at 17, M-I 4080; Agreement with Respect to Global Completion Services, Inc., Doc. No. 150-1, at 80, M-I 4245 ("Whereas, Global has entered into that certain Merger Agreement with SPS-AFOS. . . ."); Consent of the Board of Directors of SPS-AFOS International, Inc., Doc. No. 150-2, at 60, M-I 4330 ("Whereas, SPS-AFOS Group limited . . . [and] Global Completion Services, Inc. . . . intend to enter into a Stock Purchase Agreement and Plan of Merger . . . ."); Consent of the Board of Directors of Kushla, Inc., Doc. No. 150-2, at 89, M-I 4359.)  The Court finds this fact significant because the *Weintraub* Court specifically lists a merger as a type of corporate acquisition where new management retains the authority to assert and waive the corporation's attorney-client privilege. 471 U.S. at 349.  As a result of the acquisition, a transfer of stock occurred and GCS became a wholly-owned subsidiary of SPS.  (Doc. No. 150-1, at 43, M-I 4208.)  In addition, GCS personnel were retained and became SPS employees. (Gary Miller Dep. 27:2-4.)

The Court finds that, after acquiring GCS, SPS sought to run GCS's pre-existing business and manage its affairs.  Under these circumstances, SPS management stood in the shoes of prior management and controlled GCS's attorney-client privilege as it related to the company's operations.

### b.  M-I-SPS acquisition

The Court finds for similar reasons that the purchase agreement between SPS and M-I, and M-I's subsequent conduct in its operations of SPS's former business, transfers to M-I the attorney-client relationship that existed between SPS and B&M.  The Asset Purchase Agreement between the parties provided for, among other things, the transfer of

7

assets from SPS International to M-I, following a Share Purchase Agreement between SPS's parent corporation and an affiliated corporation of M-I. (*See* Asset Purchase Agreement, Doc. No. 116-2, at 3, M-I 746.) The Court finds it significant that, after M-I acquired SPS, M-I "retained many of the employees of SPS, utilized its business contacts, support staff, technology, [and] methods of doing business." (Aff. of Dennis Hanks, Doc. No. 212, Ex. D, ¶ 3.) Hanks, an account manager with M-I, further testified that M-I "continues to market and sell tools that SPS designed, developed, marketed, manufactured and/or sold." *Id.*

Gary Miller's testimony sheds further light on the nature of M-I's acquisition. Miller testified that contracts and employees were transferred from SPS to M-I, and there was no interruption of the business between the two companies. (Miller Dep. 27:14-18.)

The Court is convinced that it should follow the reasoning in *Soverain* and *Tekni-Plex*, outlined above, given the factual similarities in this case. Because M-I continues to market tools developed by SPS, has retained personnel from SPS, and has used SPS's business contacts and methods of business after the acquisition, the Court finds that M-I has an attorney-client relationship with SPS's former counsel, B&M. M-I has met the first prong of the disqualification standard. The Court now turns to the second prong.

### 2. Substantially Related Matter

As the party seeking disqualification, M-I "bears the burden of proving that the present and prior representations are substantially related." *In re American Airlines, Inc.*, 972 F.2d 605, 614 (5th Cir. 1992). M-I must "'delineate[] with specificity the subject matters, issues and causes of action' common to prior and current representations." *Id.* If M-I succeeds in establishing that the current and prior representations are substantially

8

related, an irrebuttable presumption will arise that "'relevant confidential information was disclosed during the former period of representation,'" thus requiring disqualification of B&M. *Id.*

*American Airlines* goes into a great level of detail and analysis regarding attorney disqualification. In that case, American Airlines ("American") sought to disqualify its former counsel Vinson & Elkins ("V&E") from representing plaintiff Northwest Airlines in a suit. 972 F.2d at 607. Relevant to the instant case, American asserted that V&E's prior representation of American involved substantially related matters and, as such, it could not subsequently represent Northwest, which was an adverse party to American. The Fifth Circuit held that the inquiry on the second prong was limited to "the single question of whether V&E's prior representations of American [were] substantially related" to the case. *Id.* at 621. The court then reviewed three prior V&E representations of American in order to determine whether they were substantially related to the case in question. After a detailed analysis, the court concluded that V&E's prior representation of American was substantially related to the suit, and disqualified V&E from representing adverse party Northwest.

The Court has carefully reviewed the prior and present representations in this case, and cannot come to the same conclusion. The Court does not believe that B&M's prior corporate representation of GCS and SPS is substantially related to its representation of two individuals, Stelly and Squyres, in this litigation.

Miller's deposition was particularly enlightening to this Court. Miller was a corporate lawyer who represented GCS in connection with the sale to SPS. (Miller Dep. 26:9-10.) He was the primary corporate lawyer. Once the merger took place, SPS asked

9

Miller to stay on as local counsel for the company. (*Id.* 27:5-6.) He was also involved in M-I's acquisition of SPS, albeit in a more limited role due to the transaction being handled under UK law. (*Id.* 27:15-19.) His signature can be found on the Share Purchase Agreement between the two companies. (*Id.* 22:17-20.) He stayed on until the acquisition, worked on some post-closing matters in connection with his representation of SPS shareholders, and ceased his representation. Miller never worked for M-I. (*Id.* 38:13-39:4.)

As a lawyer for two companies who underwent significant changes during his tenure, Miller did oversee a limited scope of employment issues. From the Court's review of the transcript, it appears that Miller gave advice on the transfers of officers and directors of GCS and SPS. (*Id.* 23:23-25, 24:22-25:5.) The employment contract that Miller was linked most closely to in the deposition, was the contract of a senior vice president of SPS, David Barton. But again, this representation appears to the Court to be linked to Miller's role in settling the transfer of the various officers and directors prior to, and following, the multiple acquisitions that he oversaw. Miller does not appear to have had any significant employment law experience, and certainly none that is substantially related to the issues or causes of action in this case.

M-I emphasizes that the language in Barton's non-compete clause is identical to the language contained in Benton Knobloch's employment agreement. Benton Knobloch is a Defendant in this case. The Court accepts this fact, but finds that this fact does not cut in M-I's favor. First, the Court believes that the weight of the evidence establishes that B&M had no involvement in drafting Knobloch's agreement. (*Id.* 68:22-69:17.) Second, and more importantly, B&M is not representing Knobloch in this case.

Knobloch is being represented by Schwartz, Junell, Greenberg & Oathout, LLP, a law firm not involved in this motion for disqualification.

On the subject matter and issues involved in this case—namely, Stelly and Squyres' employment contracts—Miller and B&M appear to have had no prior involvement. GCS appears to have added a two-year non-compete clause to its confidentiality agreements without any input from B&M. In addition, the specific employment contracts at issue here—non-competes and confidentiality agreements—were executed between M-I and Stelly and Squyres individually, after the acquisition.

Finally, M-I argues that B&M's billing records include multiple entries referring to employment "issues," trade secrets, and misappropriation. (Doc. No. 212, at 14-18.) This evidence is too vague for the Court to conclude that the matters are substantially related. No information is provided as to what employment matters, if any, were handled in those billing entries. The Court does not believe that oblique references to trade secrets or misappropriation rises to the level required for disqualification. With the evidence put before it on attorney billing matters, the Court is unwilling to assume that the vague descriptions affirmatively establish a substantial relation between the two representations. Given the extraordinary relief sought by M-I, it is inappropriate to use such uncertain evidence to order a sweeping disqualification of counsel.

It took a much more involved representation in *American Airlines* for the court to order disqualification. In that case, the court pointed to very specific claims that were common to prior and present representations—for example, rival Continental Airline's claim that American had misused a computerized reservation system and had engaged in a price-fixing solicitation. 972 F.2d at 622. The very focus of the case underlying

11

*American Airlines* were operations, incentives, and commissions practices that had been at the heart of the V&E's prior representations. In the case at bar, no such intimate involvement exists. The issues at the heart of this litigation—whether Stelly and Squyres violated their employment agreements—do not have any direct relation to Miller's corporate representation of GCS and SPS, much less a substantial one.

The Fifth Circuit does take a step back from its claims analysis to acknowledge that common subject matter could be the basis for substantial relation between two cases. However, any common area of law, writ broadly, will not do. Although Miller's prior representation did have a point of contact with the broad topic of employment law, the Court does not believe that the prior representation concerned "'the particular practices and procedures which are the subject matter'" of this suit. *Id.* (quoting *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1032 (5th Cir. 1981)); *see also Laker Airways Ltd. v. Pan Am. World Airways*, 103 F.R.D. 22, 40 (D.D.C. 1984) (finding that, where prior and current representations both related to same international organization, its operation and activities, relation was not sufficient because resemblances were "both general and superficial," while "specific similarities" were entirely absent). The Court will not condone an overly broad reading of subject matter where the remedy required for overlap is "severe." *In re Cap Rock Elec. Co-op, Inc.*, 35 S.W.3d 222, 230 (Tex. App.—Texarkana 2000, no pet.); *see also American Airlines*, 972 F.2d at 628.

M-I puts forth a few additional arguments in support of disqualification. These arguments must also be addressed.

First, M-I argues that if the Court grants the pending motion for summary judgment in this case, which would render certain provisions of Knobloch's employment

agreement unenforceable, M-I would have a direct malpractice claim against B&M. This follows because M-I maintains that B&M prepared Knobloch's employment agreement. As the Court determined above, however, the weight of the evidence establishes that B&M did not prepare Knobloch's employment agreement for use. Because the non-compete language is identical to a B&M-prepared contract, however, it is possible that GCS reused a similar version, with identical non-compete language, for Knobloch. The Court can express no opinion at this juncture regarding whether the non-compete clause in Knobloch's agreement is enforceable. What is certain to this Court, however, is that M-I puts forth too speculative a claim in arguing for disqualification on these grounds. In order for a malpractice claim, and thus a financial interest, to lie against B&M, this Court would have to find that the non-compete agreement was invalid, and M-I would have to take the step of filing suit against B&M for malpractice. Both of these steps are speculative at this stage. The Court will not disqualify counsel based on a hypothesized future conflict of interest, particularly where factual questions remain unanswered concerning which party is responsible for Knobloch's agreement.

Second, M-I argues that Gary Miller will be a key fact witness on the issues surrounding Knobloch's employment agreement. M-I further argues that Miller has "intimate knowledge" of SPS's and M-I's tool business. As outlined above, it remains a question whether M-I will be able to impute any knowledge or responsibility for Knobloch's agreement onto Miller or B&M. Additionally, the Court is satisfied that Miller possesses little to no understanding of the technology involved in the tools. Miller prepared agreements that transferred such tools from one party to another, but

specifically stated that he knew nothing about the technology involved. Thus, the Court declines to find a conflict of duties here.

The Court issues one last word of caution. The Court did not come to its conclusion in this case easily or lightly. It is a close question. The analysis set forth in this opinion should have been undertaken rigorously by B&M *before* accepting its current representation. Lawyers must remain punctilious about their ethical duties. Where a law firm has represented corporate predecessors to a current adversary, the ethical rules apply. It is incumbent upon every lawyer and law firm to live up to its duty of loyalty to a former client. This entails a serious examination into the issues and applicable law. Lawyers must always be mindful of the utmost importance of maintaining "'public confidence in the legal system as a means for adjudicating disputes.'" *American Airlines*, 972 F.2d at 618 (quoting *Brennan's Inc. v. Brennan's Rests., Inc.*, 590 F.2d 168, 172 (5th Cir. 1979)). Anything less than the strictest adherence to the duties owed to clients, over time, can seriously harm the profession by undermining public confidence.

### IV.   CONCLUSION

The Court believes that M-I has fallen short of "'delineat[ing] with specificity the subject matters, issues and causes of action'" common to both representations. *Id.* at 614 (quoting *Duncan*, 646 F.2d at 1029). The Amended Motion to Disqualify BoyarMiller as Counsel (Doc. No. 153) is **DENIED**.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 26th day of May, 2010.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES
THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY
OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH
THEY MAY HAVE BEEN SENT ONE BY THE COURT.**