**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **M-I L.L.C.** | § | |
| | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO.** |
| | § | **4:09-CV-01552** |
| **CHAD LEE STELLY,** | § | |
| **STEPHEN SQUYRES,** | § | |
| **BENTON THOMAS KNOBLOCH,** | § | **JURY REQUESTED** |
| **And WELLBORE ENERGY SOLUTIONS,** | § | |
| **L.L.C.** | § | |

**THIRD AMENDED COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, M-I L.L.C., hereinafter referred to as Plaintiff or "M-I", complaining of Chad Lee Stelly, Stephen Squyres, Benton Thomas Knobloch, and Wellbore Energy Solutions, LLC ("WES") hereinafter referred to as Defendants, and for cause of action would respectfully show unto the Court and jury as follows:

**I. PARTIES**

1.     Plaintiff is a corporation with an office in Harris County, Texas, and which has authority to do business in the State of Texas.

2.     Defendant Stephen Squyres has been served and answered.

3.     Defendant Chad Lee Stelly has been served and answered.

4.     Defendant, Benton Thomas Knobloch, has been served and answered.

5.     Defendant, Wellbore Energy Solutions, LLC, ("WES") is a foreign corporation doing business in Texas and has been served and answered.

## II.  VENUE AND JURISDICTION

6.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 1441, 1367 and 18 U.S.C. § 1030.

7.     Venue is proper in the Southern District of Texas because Stelly and Squyres reside in Harris County, Texas, and because a substantial part of the events or omissions giving rise to the claims plead below occurred in Harris County, Texas.

## III.  FACTUAL ALLEGATIONS

8.     M-I is an oilfield contractor providing products and services to oilfield drillers and operators who are involved in successful completion of down hole operations and the cleanout of wellbores.

9.     Squyres and Stelly were employed by M-I in its offices in Houston, Harris County, Texas.  They each executed a Trade Secret Agreement and Covenant Not to Compete. Squyres executed and agreed to his Trade Secret Agreement and Covenant Not to Compete on or around August 3, 2006, and Stelly executed and agreed to his Trade Secret Agreement and Covenant Not to Compete on or around November 5, 2002.  Pursuant to their Trade Secret Agreement and Covenant Not to Compete, Squyres and Stelly each agreed that upon termination of their employment with Plaintiff that they would maintain confidential all of Plaintiff's technology, trade secrets and proprietary and confidential information.  Squyres and Stelly also agreed not to compete against Plaintiff for a period of time of two years after such termination of employment with Plaintiff and to refrain from certain activities in competition against Plaintiff, such as providing the same or similar function with a competitor that they did with M-I.  As part of their respective agreements, Squyres and Stelly also executed an Employee Invention and Confidential Information Agreement wherein they also promised not to disclose M-I's

confidential information during their employment and thereafter.  Squyres executed and agreed to his Employee Invention and Confidential Information Agreement on August 3, 2006 and his Confidentiality Agreement on September 1, 2000.  Stelly executed and agreed to his Employee Invention and Confidential Information Agreement on November 5, 2002 and his Confidentiality Agreement on April 14, 1999.

10.     During their employment at M-I, Squyres and Stelly specialized in the rental and technical support of wellbore cleanout equipment used in down hole drilling operations.  Stelly and Squyres promoted and supported tools to M-I's customers throughout the Gulf of Mexico, Texas, Louisiana, and Alabama.  M-I provided and entrusted to Squyres and Stelly proprietary Confidential Information including but not limited to M-I's customer pricing, customer preferences, customer discounts, nonconformance reports, tool drawings and specifications, tool utilization reports, scrap reports, job proposals and procedures, project information, sales forecasts, tool research and development information, market strategies, job tracker, financial records, technology, customer contacts, technical units, procedures, and tool history (hereafter "Confidential Information").  M-I also granted Squyres access to its market strategies, financial records, technical bulletins, and employee salary information.  This is also confidential and proprietary information that gives M-I a competitive advantage.  M-I provided Squyres and Stelly with specialized training and specialized knowledge in M-I's wellbore tools and technologies, M-I's customers, sales, and its offshore Gulf Coast market.  While employed at M-I, Chad Stelly and Stephen Squyres received access to and negotiated M-I's pricing and price discounts with customers, including but not limited to BP P.L.C., Chevron Corporation, Devon Energy Corporation, Exxon Mobil Corporation, Walter Oil and Gas Corporation, Marathon Oil Corporation, and ENI S.p.A.

11.     M-I's Confidential Information, market strategies, financial records, technical bulletins, and employee salary information are proprietary information used by M-I in its business, which gives M-I a competitive advantage.  This information is kept confidential.  It is not generally known, and it is not discoverable by inspection.  M-I takes steps to keep this information secret.  Employees are required to sign trade secret and confidential information agreements, and this information is stored on M-I's intranet where it is password protected.  M-I allows access to this information to some of its employees because this access is necessary for those employees to perform their job duties.  This information is valuable to M-I, and it would be valuable to M-I's competitors, such as WES, if they obtain it.  M-I spent considerable amounts of time and money to create this information.  This information is M-I's institutional knowledge and history of its wellbore cleanout tool business.  It is the product of many years of experience, the labor of dozens of skilled employees, and millions of dollars spent in research, testing, and application.  This information is trade secret information.

12.     Despite receiving the above consideration, Squyres and Stelly quit M-I to work for WES.  WES is an oilfield service company specializing in the sales and rental of wellbore cleaning equipment and services used in down hole cleanout operations.  WES is in competition with M-I.  Stelly and Squyres are performing the same or similar function for WES that they performed for M-I.  Upon information and belief, in their employment at WES, Stelly and Squyres have used and disclosed and continue to use and disclose the aforementioned M-I trade secrets and Confidential Information, and they are competing against M-I and soliciting M-I's customers based on the relationships they formed and further developed while at M-I.  Upon information and belief, Stelly has solicited and/or is soliciting and renting competing tools to: BP P.L.C., Chevron Corporation, Devon Energy Corporation, Exxon Mobil Corporation, Walter Oil

and Gas Corporation, Marathon Oil Corporation, and ENI S.p.A.  Squyres is now soliciting and renting WES tools primarily to BP P.L.C., just as he did while at M-I.  Squyres's solicitation of BP in violation of his noncompete has caused M-I to lose BP jobs to WES.  *See* Exhibit B.

13.     Upon information and belief, Benton Knobloch and other employees of WES induced Squyres to quit M-I, and breach his contracts with M-I, for increased compensation and/or benefits or a more beneficial employment package at WES.  Squyres terminated his employment with M-I on March 24, 2008 and immediately thereafter began to work for WES in Houston, Texas performing the same or similar job duties for WES that he performed for M-I. Knobloch, Squyres, and other employees of WES induced Stelly to quit M-I and breach his contracts with M-I, for increased compensation and/or benefits or a more beneficial employment package at WES.  After accepting an offer from WES, Stelly gave M-I his notice of termination on March 9, 2009, and immediately thereafter began to perform the same or similar job duties for WES that he performed for M-I.

14.     Upon information and belief, before Stelly left M-I, Knobloch, Squyres, and other employees of WES, induced Stelly to misappropriate M-I's technology, Confidential Information, and trade secrets for use in WES's business operations.  In the days before he notified M-I that he was quitting, Stelly connected external memory devices to his M-I laptop and transferred files to these devices from the laptop.  Forensic analysis of Stelly's External Hard Drive and USB Drive revealed that M-I's files were on these devices and some of these files were transferred from Stelly's M-I issued laptop.  In addition, on March 8, 2009, Stelly began downloading M-I's files to his M-I laptop immediately after ending a cell phone conversation with Knobloch.  Similarly, on March 6, 2009, Stelly called Knobloch minutes before he plugged in an external memory device to his laptop.  Because this computer activity occurred after Stelly

accepted employment with WES and in close proximity to phone calls with Knobloch, M-I believes Stelly accessed M-I's Confidential Information and files for WES's use.   M-I's Confidential Information would be valuable to WES because it sells and rents tools that compete with M-I's tools.   Likewise, it would be valuable to Stelly because he is doing the same or similar job for WES that he did for M-I.

15.     Stelly and Squyres are performing the same or similar job duties for WES that they did for M-I and they are calling on the same customers for WES that they did for M-I. Upon information and belief, Stelly and Squyres, without authorization, have used and continue to use and disclose M-I's Confidential Information and the other trade secrets discussed above. Upon information and belief, Defendants are using the Confidential Information and the other trade secrets discussed above to interfere with M-I's business relationships with its customers.

16.     Squyres's and Stelly's conduct also violates their Confidentiality Agreements with Global Completion Services, Inc. ("GCS") in which they promised not to disclose GCS's or Specialised Petroleum Services Group Limited's ("SPS") Confidential Information.   M-I acquired these contractual rights in its acquisition of SPS.

17.     Knobloch's conduct violates contracts he executed with Specialised Petroleum Services International, Inc. f/k/a Global Completion Services, Inc. ("SPS/GCS"), then a subsidiary of SPS.   M-I acquired SPS/GCS and all affiliate companies on or around August 2, 2006.   On or around August 2, 2006, SPS/GCS assigned to M-I all its property of every kind and its contractual rights, including those arising out of the contracts with Knobloch and Squyres, as part of an Asset Purchase Agreement between M-I and SPS/GCS.   In both his Employment Agreement, dated June 11, 2001 and Confidentiality Agreement, dated June 28, 2001, Knobloch promised not to use or disclose SPS/GCS's confidential information.   In his Employment

Agreement, Knobloch also promised not to solicit SPS/GCS's customers, interfere with SPS/GCS's customer relationships, or compete with SPS/GCS.   Knobloch emailed his resignation to M-I on August 21, 2006, and his employment with M-I was terminated on August 31, 2006.   However, under Knobloch's Employment Agreement and Confidentiality Agreement, he still was required to maintain the confidentiality of M-I's trade secrets.   On and before August 31, 2006, Knobloch organized WES and engaged in competition with M-I.   On or around August 31, 2006, Knobloch, in violation of his Employment Agreement, helped form WES, a competing company, began soliciting SPS/GCS's customers and interfering with SPS/GCS's customer relationships, and solicited SPS/GCS's employees (who then worked for M-I) to breach their employment agreements with SPS/GCS and M-I in order to work for WES.

18.      SPS/GCS and M-I gave Knobloch access to its confidential information and trade secrets.   In particular, Knobloch had access to SPS/GCS's tool designs, tool drawings, technical bulletins, technical units, tool history, nonconformance reports, tool research and development, project information, budgets, revenue, expenditures, marketing and strategy plans, customer contact information, customer preferences, customer presentations, proposals to customers, and procedures.   In addition, Knobloch, as Manager of Sales for the Americas and Caribbean, had access to the same types of Confidential Information and trade secrets that Squyres did as Regional Sales Manager.   All of the above information was used by SPS/GCS in its business, and was and is now used by M-I in its tool business.   This information is not generally known, and it is not discoverable by inspection.   The aforementioned confidential information gave SPS/GCS and gives M-I a competitive advantage as it would give most competitors in the industry.   GCS/SPS and M-I took steps to keep this information secret.   SPS/GCS required employees to sign confidentiality agreements and vendors to sign licensing agreements with

confidentiality clauses.  M-I takes similar steps to keep this information secret.  Employees are required to sign trade secret and confidential information agreements, and this information is stored on M-I's intranet which is password protected.  M-I allows access to this information to some of its employees because this access is necessary for those employees to perform their duties.  This confidential information was valuable to SPS/GCS and is valuable to M-I; it would similarly be valuable to M-I's competitors, such as WES.  SPS/GCS spent considerable amounts of time and money to create this information and develop it to marketable products.  M-I spent large sums of money to obtain the rights to this information.  This information is SPS/GCS's and M-I's institutional knowledge, and includes the history of its wellbore cleanout tool business.  It is the product of many years of experience, the labor of dozens of skilled employees, and millions of dollars spent in research, development, and marketing.  This information is M-I's trade secret information.   Upon information and belief, Knobloch used and disclosed the aforementioned trade secrets and confidential information to form and operate WES to the harm of SPS/GCS and M-I.

19.    Certain WES's tools and M-I's tools have the same or similar purpose, function and use.  Upon information and belief, WES conceived, designed, manufactured, fabricated, operated, and leased tools similar to certain M-I tools by using M-I's confidential information and trade secrets including those found in M-I's engineered drawings, specifications, technical bulletins, technical units, and other documents containing M-I's trade secrets related to its wellbore cleanout tools.  M-I also believes WES conceived, designed, manufactured, fabricated, operated and leased its tools based on the personal knowledge its employees had of the M-I trade secrets underlying M-I's tools.   It is believed WES used M-I's designs, specifications, procedures, confidential information, and technologies of M-I's tools, including but not limited

to: Short Trip Jetting Sub, PosiDrift Sub, Pup Riser Brush, Riser Brush Tool, Magno Back CCT, Razorback, Bristle Back, Junk Muncher, Standard MFCT-C or Heavy Duty MFCTC, Pup Finger Basket, Quick Trip Junk Basket, Extended Pup Junk Catcher, Single Action Bypass Sub, Well Scavenger, GCS Bristle Brush, Centurion Circulating Valve, Dual Action Bypass Sub, Pressure Shear Sub and the foregoing tools' variants and predecessors.  Upon information and belief, WES used the specifications, designs, procedures, confidential information, trade secrets, and technologies underlying the above M-I tools in the conception, design, manufacture, fabrication, operation, assembly, disassembly, and lease/rental of the following WES tools: Clean Well Drill Tech, Clean Well Bristle Tech, Clean Well Vali Tech, Clean Well Turbo Tech, Clean Well Tru Drift, Clean Well Riser Bristle Tech, Casing Vor Tech Junk Bucket, Clean Well Mag Tech, Clean Well Jet Tech, Clean Well Jet Sub, Clean Well Riser Vor Tech Junk Bucket, Clean Well Mag Tech Riser Magnet, Clean Well Pressure Tech, Clean Well Combo Tech, and Vac Tech.

20.     In particular, upon information and belief, WES and Knobloch misappropriated at least those trade secrets from M-I, which are described with particularity in Exhibit A, filed under seal herewith.

21.     This pleading and Exhibit A do not provide an exclusive list of the trade secrets M-I believes WES misappropriated.  M-I believes WES's documents will identify other M-I confidential information and trade secrets WES misappropriated and allow M-I to further detail the aforementioned trade secrets M-I believes were misappropriated.  The trade secrets M-I alleges were used are not limited to those found in drawings.  M-I's trade secrets are in the nature of procedures, processes, discoveries, data, and know-how which pertain to the design, assembly, operation, function, quality control testing, and disassembly of wellbore tools and the operation of M-I's business, which were developed after years of research and development by

M-I.  Some portion of M-I's trade secrets are described and/or illustrated in tangible forms of expression.  M-I alleges Defendants not only have taken some or all of these tangible forms of expression, but also that Defendants have used and/or are currently using some or all of the procedures, discoveries, designs, specifications, data, principles, processes, know-how, and other intangible information that comprise the trade secrets underlying M-I's tools.  M-I alleges that Defendants derived and used such information in part from Defendants' own personal knowledge as a result of working for M-I.  Further discovery will reveal to what degree Defendants have used M-I's tangible documents to derive M-I's trade secrets and whether Defendants might have derived M-I's trade secrets directly from reverse engineering M-I's tools.

22.     M-I's tool designs, procedures, specifications, technology, each of the enumerated trade secrets in Exhibit A and all of the M-I confidential information discussed above are proprietary information used by M-I in its business.  This information gives M-I a competitive advantage.  This information is confidential.  It is not generally known, and it is not discoverable by inspection.  M-I takes steps to keep this information secret.  Employees are required to sign trade secret and confidential information agreements, and this information is stored on M-I's intranet, which is password protected.  M-I has confidentiality agreements with vendors who manufacture tools and tool components and third parties who inspect its tools.  M-I also has confidentiality agreements with its customers.  M-I allows certain access to this information to some of its employees because this access is necessary for those employees to perform their job duties.  This information is valuable to M-I, and it would be valuable to M-I's competitors, such as WES.  M-I spent considerable amounts of time, money, and labor to create, research, develop, test and refine this information and keep it secret.  M-I employs engineers and designers to research and develop these tool designs.  These designers and engineers take years to research

and develop a tool, and it takes substantial additional time and money to test, refine, and market these tools.

23.     In less than two years after its formation, WES had designed, manufactured, tested, and marketed an entire suite of wellbore clean out tools similar to M-I's suite of wellbore clean out tools.  Further, WES used BlueLine and, upon information and belief, other vendors, who were the same manufacturers used by SPS and/or M-I.

24.     As part of M-I's acquisition of SPS, M-I acquired all of GCS and SPS's Employment Agreements and Confidentiality Agreements, including those with Knobloch, Squyres, and other employees.  In addition, M-I entered into a Trade Secret Agreement and Covenant Not to Compete and Employee Invention and Confidential Information Agreement with these employees.  Many of these other employees were later raided by WES.  Knobloch was Manager of Sales for the Americas when he quit M-I.  Knobloch resigned from M-I and immediately formed WES, and began serving as its President in September, 2006.  Within two weeks, WES, its agents, and Knobloch induced Todd Roy to quit M-I and join WES.  Pursuant to WES's Operating Agreement, Todd Roy was listed as the initial member, and according to documents related thereto, Roy was purported to be the sole owner of WES.  Upon information and belief, Todd Roy contributed and continues to contribute to the conception, design, manufacturing, testing, fabrication, and operation of WES's tools.

25.     In 2007, WES and its agents raided three additional M-I employees: Phillip Morgan, M-I's Senior Applications Engineer; Shawna Richard-Landry, M-I's Operations Clerk; and Mark Lagrange, a Shop Technician.  Each of these employees are bound by M-I's Trade Secret Agreement and Covenant Not to Compete, and Employee Invention and Confidential Agreement.  Each of these employees worked at WES in violation of their agreements with M-I.

26.     In 2008, WES and its agents raided eight more M-I employees: Donald Turner, a Shop Technician; Nick Briscoe, an SPS Tool Service Specialist; Kevin Squyres, an SPS Tool Service Specialist; Scott Leger, a Shop Technician; Jerry Lanthier, an SPS Tool Service Specialist; Josh Cormier, an SPS Tool Service Specialist; Kevin Duhon, an assembly shop technician; and Stephen Squyres, M-I's Sales Manager.  These employees are bound by M-I's Trade Secret Agreement and Covenant Not to Compete and Employee Invention and Confidential Information Agreement.  These employees worked and/or continue to work at WES in violation of these agreements with M-I.

27.     Then on March 3, 2009, Knobloch induced Stelly to breach his employee agreement with M-I.  Before he quit, Stelly told WES and Knobloch that Stelly had a Non-Compete agreement with M-I.  WES and Knobloch willfully disregarded Stelly's agreement with M-I, just as they had disregarded the previously raided employees' agreements with M-I.  On March 16, 2009, Stelly's job assignment at WES was to support WES's "Clean Well Products" in the Gulf of Mexico.  These Clean Well Products are identified as particular tools in WES's catalogue.  The Clean Well tools directly compete with M-I's cleaning tools.

28.     Knobloch and WES induced each of the aforementioned employees and possibly others to quit M-I for increased compensation and/or other benefits, or a total increased employment package.  Each are competing against M-I in violation of their agreements with M-I.  WES and Knobloch knew and/or had reason to know of these former employees' agreements with M-I, especially the Trade Secret Agreement and Covenant Not to Compete.

29.     Defendants' misappropriation of trade secrets, breaches of contract, unfair competition, and interference with prospective business relations has caused M-I substantial harm.  Defendants' breaches of contract, tortious interference with employee contracts, breaches

of fiduciary duties, unfair competition, conspiracy, tortious interference with prospective business relations, and conversion caused M-I to lose the jobs listed in Exhibit B, filed under seal.  Defendants have taken these jobs from M-I through the use of M-I's trade secrets and confidential information, M-I's former employees and the customer relationships that were fostered, developed and/or created by M-I and SPS/GCS.

30.     These jobs constitute some of the lost profits that Defendants' breaches of contract and fiduciary duties and tortious behavior including misappropriations of trade secrets, tortious interference with M-I's employee contracts, and tortious interference with prospective business relationships and agreements, have caused M-I to suffer.  Defendants refuse to produce requested records necessary to further specify M-I's damages for Defendants' contractual violations and tortious conduct.  In particular, WES refuses to produce its project files for the projects described in Exhibit B attached hereto under seal.  These project files should specify what M-I trade secrets and former M-I employees were used on each project.  Further, WES refuses to produce invoices, quotes, bids, and proposals for projects Squyres, Stelly, and Knobloch worked on for WES after they left M-I (*i.e.,* during the time periods restricted by their Agreements with M-I).  M-I will amend its pleading and specify its damages after receipt and review of the requested WES's records, if necessary.

## IV.  CAUSES OF ACTION

### Count 1 - Breaches of Trade Secret Agreement and Covenant Not to Compete: Squyres and Stelly

31.     All previous paragraphs are incorporated herein.

32.     The Trade Secret Agreement and Covenant Not to Compete executed and agreed to by Stelly and Squyres includes a covenant not to compete.  This covenant precludes Stelly and Squyres from competing against M-I in the territory in which they were employed at M-I for a

period of two (2) years as to customers they worked with at M-I.  The Trade Secret Agreement and Covenant Not to Compete executed by Stelly and Squyres also include Stelly and Squyres's respective promises not to disclose or use M-I's Confidential Information and trade secrets.

33.    Stelly and Squyres's Trade Secret Agreement and Covenant Not to Compete agreements are enforceable under Texas law.  Stelly and Squyres's promises in these agreements were each made in exchange for M-I's promises to provide them with specialized knowledge and training, M-I's trade secrets, M-I's Proprietary Confidential Information, and M-I's goodwill. M-I fulfilled each of these promises with respect to Stelly and Squyres.  Each of the covenants arise out of the trade secret agreement because the covenant is: (1) designed to protect M-I's trade secrets, M-I's confidential and proprietary information, M-I's goodwill, and the specialized training and knowledge M-I provided to Stelly and Squyres; and (2) to enforce Stelly and Squyres's promises regarding the same.

34.    Stelly and Squyres's covenants not to compete have reasonable time, territory, and activity limitations. The covenants' limitations do not impose greater restraint than necessary to protect M-I's business interests; and M-I does not seek to enforce the covenants in any unreasonable manner or to any unreasonable extent.

35.    Stelly and Squyres breached their covenants not to compete against M-I.  Stelly and Squyres are competing with M-I for the same customers in the same territory where they worked for M-I.  Stelly and Squyres are employed by WES in the same territory where Stelly and Squyres worked for M-I, and Stelly and Squyres are performing the same or similar functions for WES that they did with M-I, namely, Stelly and Squyres are soliciting and renting WES tools to M-I's former customers.

36.     Upon information and belief, Stelly and Squyres violated their Trade Secret Agreement and Covenant Not to Compete by divulging, disclosing, and using trade secrets and/or proprietary Confidential Information as discussed above.

37.     The above breaches are material.   As a natural, probable, and foreseeable consequence and proximate cause of Stelly and Squyres's breaches, M-I has suffered and continues to suffer damages for which Stelly and Squyres are liable.   M-I seeks to recover all special, general, consequential, actual, and exemplary damages allowed by law as well as attorney fees, court costs, prejudgment, and post-judgment interest.   M-I has or will suffer damages to its business in the form of lost profits, loss of customers, loss of future business opportunities, loss of the exclusive right to use M-I's trade secrets, and loss of goodwill.   M-I seeks to recover lost profits from the above contracts that were awarded to WES as a result of Stelly and Squyres's breaches of contract.   In order to fully develop its lost profit claims, M-I must examine WES's documents to determine the value of the jobs WES obtained.   In the alternative, and in the event that M-I's lost profits are unascertainable, M-I seeks unjust enrichment damages.

38.     With respect to Stelly and Squyres's breaches of the Trade Secret Agreement, M-I seeks damages based on the value of misappropriated trade secrets when they were misappropriated; the diminution in the value of M-I's trade secrets to M-I as a result of the misappropriation and disclosure by Defendants; the lost profits M-I has suffered as a result of Defendants' misappropriation, the disgorgement of Defendants' profits associated with the use of M-I's trade secrets, a reasonable royalty which the Defendants would have been willing to pay and M-I would have been willing to accept for the use of M-I's trade secrets; and Defendants' "unjust enrichment" resulting from the misappropriation of M-I's trade secrets.   Unjust

enrichment includes the following: (1) Defendants' profits resulting from the use of the trade secrets; (2) Defendants' profits on sales made possible by product development which was accelerated by the misappropriation of the trade secrets; and/or (3) avoided development costs resulting from the misappropriation. In addition, M-I is entitled to injunctive relief to prevent all such imminent and irreparable harm for which it has no adequate remedy at law. Stelly and Squyres have agreed that M-I is entitled to such injunctive relief in these very circumstances in their contracts.

39.     Defendant Stelly further expended funds and obtained reimbursement therefor from M-I contrary to the stated policies of M-I with respect to expenses for which M-I would allow reimbursement. M-I seeks recovery of those funds. M-I seeks to recover all damages allowed by law as well as court costs, prejudgment interest, and post-judgment interest.

**Count 2 - Breaches of Employee Invention and Confidential Information Agreements: Stelly and Squyres**

40.     All previous paragraphs are incorporated herein.

41.     Stelly and Squyres each had an Employee Invention and Confidential Information Agreement with M-I wherein they promised to not disclose M-I's confidential information in exchange for employment and access to M-I's confidential information.

42.     As discussed above, upon information and belief, Stelly and Squyres violated their Employee Invention and Confidential Information Agreements by divulging or inevitably using and continuing to use M-I's Confidential Information and the other confidential information discussed above.

43.     The above breaches were material. As a natural, probable, and foreseeable consequence and proximate cause of Stelly and Squyres's breaches, M-I has suffered and continues to suffer damages for which Stelly and Squyres are liable. M-I seeks to recover all

special, general, consequential, actual, and exemplary damages allowed by law as well as attorney fees, court costs, prejudgment interest, and post-judgment interest.  M-I has or will suffer damages to its business in the form of lost profits, loss of customers and loss of future business opportunities, loss of the exclusive right to use M-I's trade secrets, and loss of goodwill. In particular, M-I seeks damages based on the value of misappropriated trade secrets and confidential information when they were misappropriated; the diminution in the value of M-I's trade secrets and confidential information to M-I as a result of the misappropriation and disclosure by Defendants; the lost profits M-I has suffered as a result of Defendants' misappropriation and disclosure, the disgorgement of Defendants' profits associated with the use of M-I's trade secrets and confidential information, a reasonable royalty which the Defendants would have been willing to pay and M-I would have been willing to accept for the use or disclosure of M-I's trade secrets and confidential information; and Defendants' "unjust enrichment" resulting from the misappropriation and disclosure of M-I's trade secrets and confidential information.  Unjust enrichment includes the following: (1) Defendants' profits resulting from the use or disclosure of the trade secrets and confidential information; (2) Defendants' profits on sales made possible by product development which was accelerated by the misappropriation of the trade secrets and disclosure of confidential information; and/or (3) avoided development costs resulting from the misappropriation and disclosure.  In addition to these damages, M-I seeks permanent injunctive relief to prevent all such irreparable harm in the future for which it has no adequate remedy at law.  Stelly and Squyres have agreed that M-I is entitled to such injunctive relief in these very circumstances in their contracts.

**Count 3 - Common Law Misappropriation of Trade Secrets: Knobloch, WES, Stelly and Squyres**

44.     All previous paragraphs and all Exhibits attached hereto are incorporated herein. In particular, paragraphs 10-30 and Exhibit A identify with particularity the trade secrets that Defendants had access to and the trade secrets that M-I, upon information and belief, alleges Defendants have misappropriated.  These trade secrets include all trade secrets referenced above including the "Confidential Information," tool designs, drawings, procedures, specifications, product assembly/disassembly/testing know-how, as well as the enumerated trade secrets in Exhibit A and all other information described above as a trade secret or confidential information. M-I will amend or supplement its claims with additional details once discovery proceeds.  Thus far, Defendants have refused to allow M-I any discovery of WES's tools or trade secrets even though there is a Protective Order in place.

45.     M-I has suffered and continues to suffer damages that are a natural, probable, and foreseeable consequence and proximate cause of Defendants' use and disclosure of M-I's trade secrets and Confidential Information.  M-I seeks to recover all special, general, consequential, actual, and exemplary damages allowed by law as well as attorney fees, court costs, prejudgment interest, and post-judgment interest.  In particular, M-I seeks damages based on the value of misappropriated trade secrets when they were misappropriated; the diminution in the value of M-I's trade secrets to M-I as a result of the misappropriation and disclosure by Defendants; the lost profits M-I has suffered as a result of Defendants' misappropriation, the disgorgement of Defendants' profits associated with the use of M-I's trade secrets, a reasonable royalty which Defendants would have been willing to pay and M-I would have been willing to accept for the use of M-I's trade secrets; and Defendants' "unjust enrichment" resulting from the misappropriation of M-I's trade secrets.  Unjust enrichment includes the following: (1) Defendants' profits resulting from the use of the trade secrets; (2) Defendants' profits on sales

made possible by product development which was accelerated by the misappropriation of the trade secrets; and/or (3) avoided development costs resulting from the misappropriation. In addition to these damages, M-I seeks permanent injunctive relief to prevent all such imminent and irreparable harm in the future.

**Count 4 - Tortious Interference with Prospective Business Relations and Contracts: Knobloch, WES, Stelly and Squyres**

46.     All previous paragraphs are incorporated herein.

47.     In addition to diverting existing business and interfering with existing contracts, M-I believes that Defendants are intentionally and willfully interfering with M-I's prospective business relationships.  Defendants are using the customer relationships that M-I's former employees formed and developed with M-I to interfere with M-I's prospective contracts and business with these customers.  Upon information and belief, Defendants are able to accomplish this interference by using Squyres and Stelly's, and other former M-I employees' knowledge of M-I's trade secrets, customer relationships, and Confidential Information to encourage M-I's current, former, and/or prospective customers to contract with WES instead of M-I.  M-I believes that Defendants' intentional and willful interference is causing these customers to cancel, withdraw or transfer their business from M-I to WES.  The above conduct by Defendants is independently wrongful and tortious because they are using their knowledge of M-I's trade secrets and Confidential Information, breaching their fiduciary duties to and agreements with M-I while interfering with M-I's prospective business relations.  WES also intentionally and willfully interfered with M-I's employee contracts to effectuate Defendants' interference with M-I's prospective business relationships and customer agreements.  Defendants are using the customer relationships that they and other former M-I employees formed and developed while

working for M-I to interfere with M-I's prospective contracts and business relationships with these customers on certain wells. M-I and/or SPS gave Defendants and other former M-I employees working at WES access to these customer relationships. Upon information and belief, Defendants have committed and continue to commit these tortious acts with the conscious desire to prevent M-I from entering into prospective contracts and business relationships. Upon information and belief, as a result of Defendants' conduct, Defendants knew that interference with these prospective contracts and relationships was certain or substantially certain to occur.

48.   Defendants' conduct is unjustified and thus constitutes tortious interference with M-I's prospective business relationships and contracts including but not limited to those listed in Exhibit C, filed under seal.

49.   Defendants interfered with these prospective contracts and business relationships. It is likely that M-I would have been awarded those jobs but for WES's interference. M-I expected to lease wellbore cleanout tools to these customers for these wells. M-I prepared and submitted cost estimates, proposals, and/or bids for each of the projects listed in Exhibit D, which is attached hereto and filed under seal. M-I had pricing agreements with each of the customers listed in Exhibit E, which is attached hereto and filed under seal. M-I had previously provided wellbore cleanout tools to each of the customers listed in Exhibit F, which is attached hereto and filed under seal. M-I provided drilling fluids materials on many of these lost jobs to WES as listed in Exhibit G, which is attached hereto and filed under seal. Further, it is M-I's contention that it would have been awarded these wells because it has been a leader in the marketplace with regard to wellbore cleanout tools, and M-I's commitment to providing quality products has allowed it to have a competitive edge in the marketplace. In sum, it is reasonably probable that M-I would have provided wellbore cleanout tools for the jobs described in Exhibit

C, because: (1) M-I submitted bids, proposals, and cost estimates for those jobs; (2) M-I had pricing agreements with most of those customers; (3) M-I previously provided cleanout tools to the vast majority of those customers; and (4) M-I provided drilling fluids on many of these same wells.

50.      As a proximate cause of Defendants' tortious interference, M-I has suffered and will continue to suffer damages.  M-I seeks to recover all special, general, consequential, actual, and exemplary damages allowed by law as well as attorney fees, court costs, prejudgment interest, and post-judgment interest.  M-I has suffered an amount of damages to its business in the form of lost profits, loss of customers, loss of future business opportunities, loss of the exclusive right to use its trade secrets, and loss of goodwill.  M-I would state that it is entitled to recover lost profits from the above contracts that were awarded to WES as result of Defendants' intentional and willful conduct.  In order to substantiate its lost profit claims, M-I must examine the documents from WES to determine the value of the jobs that were awarded to WES.  In the alternative and in the event that M-I's lost profits are unascertainable, M-I would seek unjust enrichment damages.

**Count 5 - Tortious Interference with M-I's Employment Contracts - Knobloch, WES, and Squyres**

51.      All previous paragraphs are incorporated herein.

52.      M-I had valid contracts with the aforementioned employees, including but not limited to its Trade Secret Agreement and Covenant Not to Compete, its Employee Invention and Confidential Information Agreement, GCS and SPS's Confidentiality Agreements and/or at-will employment agreements.  WES and its agents, including Knobloch and Squyres, knew or had reason to know of the above contracts, specifically the employment agreement, Employee

Invention and Confidential Information Agreement, and Trade Secret Agreement and Covenant Not to Compete because Squyres and other WES agents had essentially the same agreements with M-I when they were employed by M-I.  WES and its agents willfully and intentionally interfered with the contracts.  WES and its agents induced the former employees to quit M-I and join WES.  WES offered them increased compensation and/or other benefits.  The former employees perform or performed the same duties for WES they did for M-I.  These former employees are violating or have violated their covenants not to compete.  Upon information and belief, the former M-I employees have used and continue to use M-I, SPS, and GCS's confidential information and trade secrets in their employment with WES.

53.     M-I has suffered and continues to suffer damages that are a natural, probable, and foreseeable consequence and proximate cause of Defendants' interference.  M-I seeks to recover all damages allowed by law as well as attorney fees, court costs, prejudgment interest, and post-judgment interest.  In addition, M-I seeks permanent injunctive relief to prevent all such irreparable harm.  M-I has or will suffer an amount of damages to its business in the form of replacement of labor, the cost of training new employees, lost productivity, downtime, lost profits, loss of customers, loss of goodwill, loss of the exclusive right to use its trade secrets, and loss of future business opportunities.  M-I also seeks to recover lost profits from the above contracts that were awarded to WES as a result of Defendants' willful and intentional conduct.  In order to fully develop its lost profit claims, M-I must examine the documents from WES to determine the value of the jobs that were awarded to WES.  In the alternative, and in the event that M-I's lost profits are unascertainable, M-I would seek unjust enrichment damages.

**Count 6 - Breach of Fiduciary Duty: Stelly, Squyres, and Knobloch**

54.     All previous paragraphs are incorporated herein.

55.     Stelly, Squyres, Knobloch, and agents of WES, former employees of M-I, each owed M-I a fiduciary duty.  This fiduciary duty survives termination of employment with M-I.  This fiduciary duty includes, among other things, a duty not to: (1) misappropriate M-I's trade secrets and Confidential Information; (2) solicit the departure of other M-I employees while working for M-I; or (3) form a competing enterprise.

56.     Upon information and belief, Knobloch, Stelly and Squyres and agents of WES breached their respective fiduciary duties to their benefit by appropriating M-I's trade secrets and Confidential Information, soliciting or obtaining the departure of other M-I employees.  Further, Knobloch breached his fiduciary duty to M-I by forming, organizing, and fostering a competing enterprise while employed with M-I.

57.     M-I has suffered and continues to suffer damages that are a natural, probable, and foreseeable consequence and proximate cause of Stelly, Squyres, and Knobloch's breaches of fiduciary duty.  M-I seeks to recover all special, general, consequential, actual, and exemplary damages allowed by law as well as attorney fees, court costs, prejudgment interest, and post-judgment interest.  M-I has or will suffer an amount of damages to its business in the form of lost profits, loss of customers, loss of future business opportunities, loss of the exclusive right to use its trade secrets, and loss of goodwill.  M-I also seeks to recover lost profits from the above contracts that were awarded to WES as result of Defendants' breaches of fiduciary duties.  In order to fully develop its lost profit claims, M-I must examine the documents from WES to determine the value of the jobs that were awarded to WES.  In the alternative, and in the event that M-I's lost profits are unascertainable, M-I would seek unjust enrichment damages.

58.     For Defendants' misappropriation of M-I's trade secrets, M-I seeks damages based on the value of misappropriated trade secrets when they were misappropriated; the

diminution in the value of M-I's trade secrets to M-I as a result of the misappropriation and disclosure by Defendants; the lost profits M-I has suffered as a result of Defendants' misappropriation, the disgorgement of Defendants' profits associated with the use of M-I's trade secrets, a reasonable royalty which the Defendants would have been willing to pay and M-I would have been willing to accept for the use of M-I's trade secrets; and Defendants' "unjust enrichment" resulting from the misappropriation of M-I's trade secrets.   Unjust enrichment includes the following: (1) Defendants' profits resulting from the use of the trade secrets; (2) Defendants' profits on sales made possible by product development which was accelerated by the misappropriation of the trade secrets; and/or (3) avoided development costs resulting from the misappropriation.   In addition, M-I seeks permanent injunctive relief to prevent all such imminent and irreparable harm in the future.

**Count 7 – Conspiracy:  Knobloch, WES, Stelly and Squyres**

59.     All previous paragraphs are incorporated herein.

60.     Defendants have secretly and intentionally conspired, agreed, and endeavored to interfere with M-I's prospective business relationships and contracts and employee contracts, deprive M-I of business goodwill, and damage M-I's reputation.   This conspiracy has proximately caused M-I to suffer damages.

61.     Defendants, agreed to interfere with M-I's prospective contracts with M-I's customers and M-I's contracts with its employees.  Defendants knew that this interference would result in harm to M-I.

62.     M-I has suffered, and continues to suffer, damages that are proximately caused by Defendants' conspiracy to interfere with M-I's contracts with its current, former, and prospective customers and employees.  M-I seeks to recover all special, general, consequential, actual, and

exemplary damages allowed by law as well as court costs, prejudgment interest, and post-judgment interest.  M-I has or will suffer an amount of damages to its business in the form of lost profits, loss of customers, loss of future business opportunities, loss of the exclusive right to use its trade secrets, and loss of goodwill.

**Count 8 - Unfair Competition by Misappropriation and Use: Knobloch and WES**

63.     All previous paragraphs are incorporated herein.

64.     M-I developed its wellbore cleanout tools, operating technology, tool features, tool components, assembly/disassembly protocol, and quality control testing procedures through extensive time, labor, and money.  M-I's tools, tool features, technology, and tool components took several years and millions of dollars to create, test, and market.  These tools, operating technology, tool features, tool components, assembly/disassembly protocol, and quality control testing procedures were designed and evaluated by skilled designers and engineers.

65.     WES's tools have the same purpose, function, and use as M-I's tools.  Upon information and belief, WES's tools have the same components and features of many of M-I's tools.  WES conceived, designed, manufactured, and marketed its tools in a short period of time. WES employed former M-I and SPS employees who had knowledge of M-I's wellbore cleanout tools, technology, tool components, and tool features.  These former employees contributed to the conception, design, fabrication, manufacturing, operations, and marketing of WES's wellbore cleanout tools.  Upon information and belief, Knobloch and WES have misappropriated and used M-I's tools, operating technology, tool features, tool components, assembly/disassembly protocol, and quality control testing procedures to compete with M-I technology, and gained a special advantage because they did not have to put in the time, labor, skill, and money necessary to create, test and market their competing tools, operating technology, tool features, tool

components, assembly/disassembly protocol, and quality control testing procedures.  Upon information and belief, Knobloch and WES used M-I's tools, operating technology, tool features, tool components, assembly/disassembly protocol, and quality control testing procedures to get a head start.  In particular, M-I believes Knobloch and WES used the tools, tool features, tool components, technologies, operating technology, and procedures described in Exhibit A.  This is not an exhaustive list.  M-I believes that upon discovery, M-I will discover additional tools, technologies, tool components, and tool features, procedures and technologies that Knobloch and WES have used.

66.     As a result, M-I has suffered and continues to suffer damages.  M-I seeks to recover all special, general, consequential, actual, and exemplary damages allowed by law as well as attorney fees, court costs, prejudgment interest, and post-judgment interest.  In particular, for Defendants' misappropriation of M-I's tools, operating technology, tool features, tool components, assembly/disassembly protocol and quality control testing procedures, M-I seeks damages based on the value of the misappropriated tools, operating technology, tool features, tool components, assembly/disassembly protocol, and quality control testing procedures when they were misappropriated; the diminution in the value of M-I's tools, operating technology, tool features, tool components, assembly/disassembly protocol, and quality control testing procedures to M-I as a result of the misappropriation and disclosure by Defendants; the lost profits M-I has suffered as a result of Defendants' misappropriation, the disgorgement of Defendants' profits associated with the use of M-I's tools, operating technology, tool features, tool components, assembly/disassembly protocol, and quality control testing procedures, a reasonable royalty which the Defendants would have been willing to pay and M-I would have been willing to accept for the use of M-I's tools, tool features, technologies, procedures and tool components; and

Defendants' "unjust enrichment" resulting from the misappropriation of M-I's tools, operating technology, tool features, tool components, assembly/disassembly protocol, and quality control testing procedures.  Unjust enrichment includes the following: (1) Defendants' profits resulting from the use of the tools, operating technology, tool features, tool components, assembly/disassembly protocol, and quality control testing procedures; (2) Defendants' profits on sales made possible by product development which was accelerated by the misappropriation of the tools, operating technology, tool features, tool components, assembly/disassembly protocol, and quality control testing procedures; and/or (3) avoided development costs resulting from the misappropriation.  In addition to these damages, M-I seeks permanent injunctive relief to prevent all such imminent and irreparable harm in the future.

## Count 9 - The Computer Fraud and Abuse Act - 18 U.S.C. § 1030:  Knobloch, WES, Stelly and Squyres

67.     All previous paragraphs are incorporated herein.

68.     M-I's computers are used in interstate commerce, thus M-I's computers are protected computers pursuant to 18 U.S.C. § 1030 (e)(2)(B).

69.     Defendants knowingly and with intent to defraud, accessed and used the computer(s) assigned by M-I, without authorization or in a manner exceeding any authorization they may claim that they had.  By means of such conduct, Defendants furthered the intended fraud.

70.     M-I believes that, because of Stelly's activities in March 2009, Defendants used M-I's computer to misappropriate, use, and share M-I's trade secrets and proprietary Confidential Information without authorization.

71.     Because of Defendants' actions, M-I suffered losses in excess of $5,000, including costs related to an IT analysis by Guidance Software, Inc. for computer forensic

preservation and analysis of Stelly's M-I issued laptop and blackberry, Stelly's external hard drive and USB drive.

**Count 10 – Breaches of Employment and Confidentiality Contracts: Knobloch**

72.     All previous paragraphs are incorporated herein.

73.     The Employment Agreement and the Confidentiality Agreement are both valid and enforceable contracts to which Knobloch agreed.  M-I purchased and received by assignment all of the rights and obligations of those contracts when it acquired SPS/GCS.

74.     Knobloch has breached and continues to breach these contracts.  Knobloch breached and continues to breach the contracts by using and disclosing SPS/GCS's Confidential Information.  Further, Knobloch breached the Employment Agreement by forming and operating WES, competing with M-I, and soliciting SPS/GCS employees and customers within six months of his termination at M-I.

75.     Knobloch's breaches were material.  As a natural, probable, and foreseeable consequence and proximate cause of Knobloch's breaches, M-I has suffered and continues to suffer damages.  M-I seeks to recover all damages allowed by law as well as attorney fees, court costs, prejudgment interest, and post-judgment interest.  In particular, M-I seeks the damages to its business in the form of SPS/GCS's lost profits, loss of customers, loss of goodwill, loss of the exclusive right to use M-I's trade secrets, and loss of future business opportunities.  For Knobloch's misappropriation of M-I's trade secrets, M-I seeks damages based on the value of misappropriated trade secrets when they were misappropriated; the diminution in the value of M-I's trade secrets to M-I as a result of the misappropriation and disclosure by Knobloch; the lost profits M-I has suffered as a result of Knobloch's misappropriation, the disgorgement of Knobloch's profits associated with the use of M-I's trade secrets, a reasonable royalty which

Knobloch would have been willing to pay and M-I would have been willing to accept for the use of M-I's trade secrets; and Knobloch's "unjust enrichment" resulting from the misappropriation of M-I's trade secrets.   Unjust enrichment includes the following: (1) Knobloch's profits resulting from the use of the trade secrets; (2) Knobloch's profits on sales made possible by product development which was accelerated by the misappropriation of the trade secrets; and/or (3) avoided development costs resulting from the misappropriation.   In addition, M-I seeks permanent injunctive relief to prevent such further and irreparable harm.   Knobloch has agreed that M-I is entitled to such injunctive relief and consented thereto.

**Count 11 - Breach of GCS/SPS Confidentiality Agreement by Squyres and Stelly**

76.     All previous paragraphs are incorporated herein.

77.     In the alternative to the contracts described in Count 1 and Count 2, M-I seeks to enforce the Confidentiality Agreement against Squyres and Stelly.

78.     Upon information and belief, Squyres and Stelly violated the nondisclosure provisions within the Confidentiality Agreement by divulging trade secrets and/or proprietary Confidential Information.   During their respective employment with SPS and GCS, SPS/GCS provided Squyres and Stelly with the aforementioned trade secrets and proprietary Confidential Information. Upon information and belief, Squyres and Stelly are using and disclosing this information in their employment with WES.

79.     The above breaches were material.   As a natural, probable, and foreseeable consequence and proximate cause of Stelly and Squyres's breaches, M-I has suffered and continues to suffer damages for which Squyres and Stelly are liable.   M-I seeks to recover all special, general, consequential, actual, and exemplary damages allowed by law as well as attorney fees, court costs, prejudgment interest, and post-judgment interest.   M-I has or will

suffer an amount of damages to its business in the form of lost profits, loss of customers, loss of the exclusive right to use M-I's trade secrets, loss of goodwill, and loss of future business opportunities and goodwill.   In particular, for Defendants' misappropriation of M-I's trade secrets and disclosure of confidential information, M-I seeks damages based on the value of misappropriated trade secrets and disclosed confidential information when they were misappropriated; the diminution in the value of M-I's trade secrets and confidential information to M-I as a result of the misappropriation and disclosure by Defendants; the lost profits M-I has suffered as a result of Defendants' misappropriation and disclosure, the disgorgement of Defendants' profits associated with the use and disclosure of M-I's trade secrets and confidential information, a reasonable royalty which the Defendants would have been willing to pay and M-I would have been willing to accept for the use and disclosure of M-I's trade secrets and confidential information; and Defendants' "unjust enrichment" resulting from the misappropriation and disclosure of M-I's trade secrets and confidential information.   Unjust enrichment includes the following: (1) Defendants' profits resulting from the use and disclosure of the trade secrets and confidential information; (2) Defendants' profits on sales made possible by product development which was accelerated by the misappropriation and disclosure of the trade secrets and confidential information; and/or (3) avoided development costs resulting from the misappropriation and disclosure.   In addition, M-I seeks permanent injunctive relief to prevent further such irreparable harm.

## V.  ATTORNEY FEES AND INTEREST

80.     Pursuant to TEX. CIV. PRAC. & REM. CODE Sections 38.001, et seq., 18 U.S.C. § 1030, common law, and the contracts with Defendants, Plaintiff is entitled to an award of its reasonable and necessary attorney fees with respect to Defendants for this cause and any appeals.

Plaintiff hereby seeks recovery of all such amounts.  Plaintiff has complied with all conditions precedent necessary for the recovery of its attorney fees.  In addition, Plaintiff seeks interest, at law and at equity, and also as damages, both pre and post judgment.

81.     All conditions precedent to an outcome favorable to the party represented by the undersigned in this action have been performed, have occurred, or have been waived.

## VI.  EXEMPLARY DAMAGES

82.     The conduct of Defendants, as alleged above, including tortious interference with employee contracts, tortious interference with prospective business relationships and contracts, misappropriation and disclosure of trade secrets, and civil conspiracy, was aggravated by the kind of willfulness, wantonness and malice for which the law allows for the imposition of exemplary damages.  Moreover, Defendants' wrongdoing was committed knowingly and with a conscious indifference to M-I's rights.  Defendants acted with intent to harm M-I and their misconduct and tortious interference was intentional, willful, wanton and without justification or excuse.  Therefore, M-I seeks to recover exemplary damages from Defendants in an amount to be determined by the Court.

## VII.  APPLICATION FOR INJUNCTIVE RELIEF

### Count 12 - Request for Permanent Injunction

83.     All previous paragraphs are incorporated herein.

84.     In addition to the application for preliminary injunction brought in prior pleadings, and the agreed temporary injunction with respect to certain temporary matters recited therein between some of the parties, and without waiving the same and insisting upon the enforcement thereof, Plaintiff seeks additional and complementary permanent injunctive relief.

316474.1                                          31

85.     M-I requests a Permanent Injunction that Defendants, and each of their agents, servants, representatives, and all other persons or entities in active concert or participation with Defendants who receive actual notice of this Order by personal service or otherwise be and hereby are enjoined as follows:

(a)     Defendants are ordered to return to M-I, and to cease and desist from using, any M-I proprietary documents, electronic files or other property, including but not limited to M-I's drawings, non-conformance reports, designs, technical manuals, plans, proposals, marketing and sales plans, customer lists, costs and pricing information, sales and market reports, and geologic information or any WES document that uses M-I's information;

(b)     Defendants are restrained from deleting any electronic files from their personal or work computers and/or laptops;

(c)     Defendants are restrained from inducing or attempting to induce, or from causing any person or other entity to induce or attempt to induce, any person who is an employee of M-I to breach a contract with M-I and to leave the employ of M-I;

(d)     Stelly is restrained from the promotion or lease of products or services competitive with those of M-I or providing the same or similar functions for Wellbore Energy Solutions, L.L.C. that he performed for M-I in or within a 300 mile radius of Houston, Texas until March 9, 2011;

(e)     Defendants are ordered to cease and desist from leasing, selling, promoting, or otherwise commercially using: Clean Well Drill Tech, Clean Well Bristle Tech, Clean Well Vali Tech, Clean Well Turbo Tech, Clean Well Tru Drift, Clean Well Riser Bristle Tech, Casing Vor Tech Junk Bucket, Clean Well Mag Tech, Clean Well Jet Tech, Clean Well Jet Sub, Clean Well Riser Vor Tech Junk Bucket, Clean Well Mag Tech Riser Magnet, Clean Well Pressure Tech, Clean Well Combo Tech, and Vac Tech or any other tool designed or derived by using M-I's trade secret or confidential information.

86.     Upon information and belief, Defendants used, misappropriated, and  disclosed M-I's trade secrets and/or proprietary Confidential Information and continue to do so for the purposes of furthering WES's business.  Defendants have solicited and continue to solicit M-I's customers.  It is believed that Defendants may continue to solicit M-I's employees to breach contracts with M-I in order to work for WES.  The evidence of Defendants' breach of contract,

tortious interference, unfair competition, and/or misappropriation of trade secret claims support this Court's granting of its request for injunction.   M-I would similarly be entitled to the requested relief after a trial on the merits.

87.     If M-I's Application is not granted, harm is imminent because upon information and belief, Defendants are presently in possession of M-I's trade secrets, proprietary Confidential Information and/or have transmitted M-I's trade secrets, proprietary Confidential Information to others to facilitate their use of that information for their own benefit.   In addition, upon information and belief, Defendants have solicited and continue to solicit M-I's former, current, and/or prospective customers and its employees.   Stelly and Squyres have engaged in competition with M-I in the same territory with the same customers of M-I in which they worked for M-I.   These actions are tortious and violate Knobloch, Stelly, and Squyres's fiduciary duties and/or contractual obligations to M-I.

88.     The harm that will result if the Permanent Injunction is not issued is in part irreparable.   M-I cannot be fully compensated for all such harm.   Money cannot fully compensate M-I for the loss of its trade secrets and proprietary Confidential Information, which M-I invests substantial time, money, and human capital resources to develop, and which gives M-I a competitive advantage in the marketplace and which, if used, gives to Defendants a commercial advantage.   M-I also cannot be fully compensated for the continued loss of its employees to WES.  M-I cannot be fully compensated by the loss of its goodwill that will result from the loss of its trade secrets, proprietary Confidential Information, employees, and business opportunities.

89.     The injury M-I faces outweighs the injury that would be sustained by the Defendants as a result of the injunctive relief.  The injunctive relief sought would not adversely affect public policy or the public interest.

90.     **Bond**.  M-I is willing to post the necessary reasonable bond to facilitate the above injunctive relief requested.

## VIII.  CONDITIONS PRECEDENT

91.     All conditions precedent to an outcome favorable to the party represented by the undersigned in this action have been performed, have occurred or have been waived.

## IX. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays for the following relief:

1.     A permanent injunction for the relief requested above;

2.     Upon final trial, judgment against Chad Lee Stelly, Stephen Squyres, Benton Knobloch, and Wellbore Energy Solutions, LLC, jointly and severally, for full permanent injunctive relief as requested herein, and, for the full amount of the Plaintiff's damages, special, general, consequential, actual, and exemplary;

3.     Prejudgment interest;

4.     Post judgment interest;

5.     Plaintiff's reasonable and necessary attorney fees in prosecuting its claims through trial and, if necessary appeal;

6.     All costs of suit; and

7.     Such other and further relief, at law or in equity, to which Plaintiff may show itself justly entitled.

Respectfully submitted,

LOOPER REED & McGRAW, P.C.


BY:_____//s// Ben L. Aderholt_____
Ben L. Aderholt
TSB No. 00909000
Joe Virene
TSB No. 24060779
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Tel: (713) 986-7000
Fax: (713) 986-7100
baderholt@lrmlaw.com
jvirene@lrmlaw.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

        I certify that a true copy of the foregoing has been served on all attorneys of record and persons pro se in this cause, by electronic service, electronic mail, facsimile and/or certified mail, return receipt requested, by depositing same, postpaid, in an official depository under the care and custody of the United States Postal Service on September 7, 2010.


  //s// Ben L. Aderholt_____
BEN L. ADERHOLT